[No. S020909. Feb. 11, 1993.]

GRUPE DEVELOPMENT COMPANY, Petitioner, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
CHINO UNIFIED SCHOOL DISTRICT, Real Party in Interest.

**COUNSEL**

Nossaman, Guthner, Knox & Elliott, Alvin S. Kaufer, Winfield D. Wilson and Johnny D. Griggs for Petitioner.

Ronald A. Zumbrun, Edward J. Connor, Jr., Timothy A. Bittle, James S. Burling, McDonald, Hecht & Solberg, Jerold H. Goldberg and Richard A. Schulman as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

O'Melveny & Meyers, Brian S. Currey and Edward J. Szczepkowski for Real Party in Interest.

___

**OPINION**

MOSK, J.—We granted review to determine whether a local "special tax" imposed by a school district on residential property developers to fund new school construction was preempted by a comprehensive statewide legislative reform of school construction financing. As will appear, we conclude that the "special tax" in this case was thus preempted, and hence affirm the judgment of the Court of Appeal.

In 1978 the electorate adopted, as part of Proposition 13, new article XIII A, section 4, of the Constitution, declaring that "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district," except ad valorem real property taxes. In 1979 the Legislature generally authorized cities and counties to impose such taxes (Gov. Code, § 50075),[1] and, effective July 20, 1980, extended that authorization to districts (Stats. 1980, ch. 672, § 1, p. 1866).

On April 8, 1980, the Chino Unified School District (hereafter the District) submitted to its local voters a proposal to impose a "special tax" to fund new school construction necessitated by an influx of residential development within its borders. The proposal, entitled Measure C, was to levy a charge on all new residential construction in the District at the rate of $1,500 per dwelling unit, adjusted annually for inflation. The proceeds were to be used "solely for capital outlay purposes for providing additional classroom facilities to accommodate students" of the District. The county counsel's analysis stated that the charge would be levied only on persons receiving building permits for new residential construction and those holding title to such property, and would be payable to the District at the time the permits issued. The proceeds would be cumulative to the ad valorem property tax proceeds received by the District. Measure C passed by more than a two-thirds vote; it took effect immediately, and the District began collecting the amounts due thereunder.

A "sunset" provision in Measure C required the District to resubmit it to the voters within four years. Accordingly, in November 1983 the local electorate passed, again by a two-thirds vote, a measure that for all practical

___

[1]All undesignated statutory references hereafter are to the Government Code.

purposes simply extended the provisions of Measure C.[2] The 1983 version took effect on April 8, 1984.

In 1986 the Legislature enacted section 65995; as will be discussed more fully below, the statute was part of a larger legislative program for school construction financing. Section 65995 specifically authorized school districts to impose a fee on new residential developments for the construction of school facilities. The statute also placed a cap on the amount of such fee, however, and declared that it preempted all local measures on the subject. Since section 65995 took effect on January 1, 1987, the District has required payment of the maximum amount of this statutory fee in addition to the amount it collects under Measure C.

Grupe Development Company (hereafter Grupe) is a developer of residential property in the District. During the 180-day period preceding the filing of its complaint on July 22, 1988, it paid both the foregoing exactions to the District in order to obtain building permits. In its complaint Grupe sought a refund of the Measure C amounts, contending on various grounds that they were unlawfully collected. Its primary argument was that Measure C was not in fact a "special tax" but rather a school-impact development fee, and hence was preempted by section 65995. In the alternative, Grupe contended that even if Measure C was a "special tax" it was nevertheless included within the reach of section 65995 and remained preempted by that statute.

Both parties moved for summary judgment or summary adjudication of facts. After a somewhat complicated procedural history, the trial court ruled against Grupe on all issues. The order was vacated by the Court of Appeal on Grupe's petition for writ of mandate. Following *California Bldg. Industry Assn.* v. *Governing Bd.* (1988) 206 Cal.App.3d 212 [253 Cal.Rptr. 497], the Court of Appeal held that Measure C was preempted by section 65995 because it was not in fact a "special tax" but rather a school-impact development fee.

We granted review, and now reach the same result as the Court of Appeal but for a different reason: as will appear, we conclude that even if Measure C was a "special tax" it was preempted by section 65995. To understand why this is so, it is necessary to review the history of school financing legislation in this state.

"In California the financing of public school facilities has traditionally been the responsibility of local government. 'Before the *Serrano* v. *Priest*

---

[2]The 1983 version raised the charge to $1,850 per new dwelling unit, and the charge will continue to be adjusted annually for inflation. The measure now specifies that "additions to existing dwelling units" will not trigger the charge, and there is no longer a "sunset" provision.

decision in 1971, school districts supported their activities mainly by levying ad valorem taxes on real property within their districts.' [Citation.] Specifically, . . . school districts . . . financed the construction and maintenance of school facilities mainly through the issuance of local bonds repaid from real property taxes." (*Candid Enterprises, Inc.* v. *Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 881 [218 Cal.Rptr. 303, 705 P.2d 876].)

"In the early 1970's, in the wake of increased resistance throughout California to rising property taxes, local governments found themselves faced with the task of devising new methods to finance construction of school facilities. A wave of residential development, causing serious overcrowding in local schools, contributed to the problem. (See, generally, *Builders Assn. of Santa Clara-Santa Cruz Counties* v. *Superior Court* (1974) 13 Cal.3d 225, 227-230 [118 Cal.Rptr. 158, 529 P.2d 582] (*Builders Assn.*) *Candid Enterprises, Inc.* v. *Grossmont Union High School Dist.*[, *supra,*] 39 Cal.3d 878, 881-885 [218 Cal.Rptr. 303, 705 P.2d 876] (*Candid Enterprises*).)

"In an effort to keep pace with the continuing influx of new students, local governments began the practice of imposing fees on developers to cover the costs of new school facilities made necessary by the new housing. Such 'school-impact fees' were generally considered to be a valid exercise of the police power under the California Constitution (Cal. Const., art. XI, § 7), so long as the local entity could demonstrate a reasonable relationship between the fee imposed and the need for increased facilities created by the development. (*Builders Assn., supra,* 13 Cal.3d at p. 232, fn. 6; *Candid Enterprises, supra,* 39 Cal.3d at p. 885.)" (*Shapell Industries, Inc.* v. *Governing Board* (1991) 1 Cal.App.4th 218, 225-226 [1 Cal.Rptr.2d 818].)

In 1977 the Legislature took its first major step towards a statewide solution to the problem, by granting local governments specific *legislative* authorization—i.e., in addition to their constitutional police power—to impose school-impact fees: "In 1977, with the passage of Senate Bill No. 201 (The School Facilities Act, effective Jan. 1, 1978), the Legislature specifically authorized cities and counties to enact ordinances requiring residential developers to pay fees to finance temporary school facilities necessitated by new development. In the preamble to the act, the Legislature set forth its findings that 'residential developments may require the expansion of existing public schools or the construction of new school facilities' and that 'funds for the construction of new classroom facilities are not available when new development occurs, resulting in the overcrowding of existing schools.' Therefore, 'new and improved methods of financing for interim school facilities necessitated by new development are needed in California.'

(Gov. Code, § 65970.)" (*Shapell Industries, Inc.* v. *Governing Board, supra,* 1 Cal.App.4th at p. 226.)

The School Facilities Act, however, was not a complete solution. ■ ■ ■ It did not authorize school districts to impose school-impact fees themselves.[3] The statute merely authorized each school district, when appropriate, to make "findings" that its schools were overcrowded and there was no feasible method of reducing that condition, and to transmit those findings to the local city council or county board of supervisors; if the latter concurred in the findings, that concurrence furnished a legal basis for the local government to impose the school-impact fees by ordinance. (§§ 65971-65972.) The fees could be used only to provide "interim," i.e., temporary, classroom facilities. (Now § 65974, subd. (a)(3).) The amount of the fees, as before, was required to be "reasonably related and limited to the need for schools caused by the development." (*Id.,* subd. (a)(4).) And, as this court subsequently held, in enacting the School Facilities Act the Legislature did not occupy the field of school construction financing and did not preempt local ordinances imposing school-impact fees under the police power. (*Candid Enterprises, supra,* 39 Cal.3d 878, 885-890.)

Nine years later the Legislature reentered the field of school financing, and this time fully and expressly occupied it. (Stats. 1986, chs. 886, 887, 888, 889.) "The School Facilities Act, as originally enacted, proved to be a stopgap measure. (*Candid Enterprises, supra,* 39 Cal.3d at p. 882.) In 1986 it was substantially revised and expanded with the passage of a comprehensive multibill package, addressing an identified $3.8 billion need for new permanent school facilities to meet the demands of an expanding population. The heart of this legislation, Assembly Bill No. 2926, consolidated the legal authority for assessment of developer fees for school facilities into a single body of law. It authorized the governing boards of the school districts themselves, rather than city councils or county boards of supervisors, to impose school-impact fees districtwide, subject to certain monetary limitations." (*Shapell Industries, Inc.* v. *Governing Board, supra,* 1 Cal.App.4th 218, 226.)

Dispelling any doubt as to its intent, the Legislature declared in the subject bill that in many parts of California real property development was

---

[3]School districts cannot impose school-impact fees under the police power. The Constitution grants local police power only to cities and counties (Cal. Const., art. XI, § 7), and the Legislature cannot extend that power to districts. (*Gilgert* v. *Stockton Port District* (1936) 7 Cal.2d 384, 387 [60 P.2d 847], disapproved on another ground in *San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205, 216, fn. 6 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973]; see also 8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 792, p. 320.)

causing serious overcrowding in schools that traditional public financing was inadequate to relieve, and "For these reasons, a comprehensive school facilities finance program based upon a partnership of state and local governments and the private sector is required to ensure the availability of school facilities to serve the population growth generated by new development." (Stats. 1986, ch. 887, § 7, subd. (d), p. 3080.) Finally, "The Legislature therefore finds that the levying of appropriate fees by school district governing boards *at the rates authorized by this act* is a reasonable method of financing the expansion and construction of school facilities resulting from new economic development within the district." (*Id.*, subd. (e), italics added.)

Implementing these findings, the Legislature enacted, among many provisions, sections 53080 and 65995. Subdivision (a) of section 65995 now declares that "Except for a fee, charge, dedication, or other requirement authorized under Section 53080 [or under the 1977 School Facilities Act] . . . no fee, charge, dedication, or other requirement shall be levied by the legislative body of a local agency against a development project . . . for the construction or reconstruction of school facilities." In turn, subdivision (a)(1) of section 53080 authorizes the governing board of any school district to levy such a "fee, charge, dedication, or other requirement" for the construction or reconstruction of school facilities, but expressly subjects that authorization to the limits imposed by subdivision (b) of section 65995. And the latter clause provides that in the case of residential development "In no event shall the amount of any [such] fees, charges, dedications, or other requirements," including any fees imposed under the 1977 School Facilities Act, exceed the rate of $1.50 per square foot of assessable space.[4]

Equally important for our purposes, "Assembly Bill No. 2926 was intended to provide the *exclusive* method of raising local financing for permanent school facilities." (*Shapell Industries, Inc.* v. *Governing Board, supra*, 1 Cal.App.4th at p. 227, italics added, fn. omitted.) Thus subdivision (d) (now subdivision (e)) of section 65995 stated unequivocally: "The Legislature finds and declares that the subject of the financing of school facilities with development fees is a matter of statewide concern. For this reason the Legislature hereby *occupies the subject matter of mandatory development fees and other development requirements* for school facilities finance *to the exclusion of all local measures on the subject.*" (Italics added.)

---

[4]The amounts currently collected under the 1986 legislation are significantly higher than $1.50 per square foot. Beginning in 1990 that amount has been, and continues to be, increased every two years to adjust for inflation. (§ 65995, subd. (b)(3).) And in 1992 the Legislature further increased the charge by approximately 66 percent when it authorized school districts to impose a surcharge of "an additional fee, charge, dedication, or other requirement of one dollar ($1) per square foot of assessable space" on residential development only. (§ 65995.3, subd. (a), added by Stats. 1992, ch. 1354, § 5.)

With this history in mind we address the question whether Measure C is a "fee, charge, dedication, or other requirement" within the meaning of section 65995, and therefore expressly preempted by that statute. For three principal reasons, we conclude that it is.

To begin with, to hold that section 65995 preempts Measure C best fulfills the intent of the Legislature, which is "our primary task." (*Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934].) As explained above, section 65995 was an integral part of the Legislature's comprehensive revision of the subject of school financing in 1986. The legislation was designed, first, to bring order out of confusion. Prior to its enactment, different school districts had used different methods for meeting their financing needs: as noted above, even measures taken under the 1977 School Facilities Act were required to coexist with ordinances of local governments imposing school-impact fees under their police power. (*Candid Enterprises, supra,* 38 Cal.3d 878.) The 1986 legislation gathered all such financing under one umbrella and imposed statewide uniformity on the process, expressly occupying the field and preempting "all local measures on the subject." (§ 65995, subd. (e).) It would plainly frustrate this legislative purpose to construe section 65995 to allow an entire category of such "local measures"—i.e., special taxes—to escape the unifying reach of this legislation.

The second purpose of the 1986 revision was to make the process of school financing more responsive to need, by authorizing school districts for the first time to impose development charges themselves rather than ask their local governments to do so on their behalf. Yet the latter political step—i.e., review of the proposed charge by the local city council or county board of supervisors—had the effect of maintaining a balance between each district's need to fund school construction caused by residential development and the community's need to ensure an adequate supply of affordable housing. The 1986 legislation restored that balance by placing a cap on the amount that school districts could exact to offset such development costs. (§§ 65995, subd. (b)(1), 65995.3, subd. (a); see fn. 4, *ante.*) It would manifestly upset that balance to construe section 65995 to allow school districts to collect—as the District does here—special taxes to offset development costs *in addition to* the maximum amount authorized under the 1986 legislation.

Next, in light of the purposes of this legislation it would be unreasonable to read the language of section 65995 as excluding special taxes. The statute prohibits levying any "fee, charge, dedication, or other requirement" against a development project for school construction. A special tax is not a

"dedication," i.e., of land, and we shall assume arguendo that it is not a "fee." But a special tax could well be deemed to fall within the more inclusive word, "charge." For example, in *Associated Homebuilders* v. *City of Livermore* (1961) 56 Cal.2d 847 [17 Cal.Rptr. 5, 366 P.2d 448], this court characterized an exaction of $150 per dwelling unit levied on new sewer connections to residential construction as an "excise tax," but upheld it as a "charge." We reasoned (at pp. 852-853) that the exaction "is in the nature of an excise tax imposed on all persons thereafter applying for building permits for the privilege of connection to (and is reasonably commensurate with the burden to be imposed on) the facilities of defendant's sewer system." But we upheld the measure as a proper exercise of the power vested in defendant city by Health and Safety Code section 5471, which did not speak of taxes; rather, it authorized a city to levy "fees, tolls, rates, rentals, or other charges" for sewer services and facilities. We declared (at p. 852) that the exactions in question "fall within the stated scope of section 5471 and are authorized by it as 'fees . . . *or other charges* for services and facilities furnished by [defendant city] . . . in connection with its sanitation or sewerage systems; . . .'" (Italics added.) If the excise tax in *Associated Homebuilders* is thus a "fee or other charge," so too is the special tax in the case at bar.

If Measure C is not such a "charge," it is at least an "other requirement . . . levied by the legislative body of a local agency against a development project . . . for the construction or reconstruction of school facilities." (§ 65995, subd. (a).) It is certainly levied for the purpose just stated; and it is no less one of the "requirements" that each developer must satisfy in order to obtain a building permit: failure to pay the amount due under Measure C, like failure to pay a filing fee required by a building code, will result in denial of the permit.[5] Indeed, there is textual evidence that the Legislature intended the phrase, "other requirement," to serve as a catchall for *all* exactions imposed as a condition to development, however denominated. In the clause of section 65995 that declares the purpose of the statute (subd. (a)), the Legislature states that no "fee, charge, dedication, or other requirement" for school construction shall exceed the dollar amount it then prescribes; but in the clause of the same statute that declares its intent to occupy the field (subd. (e)), the Legislature states simply that it occupies the subject matter of "development fees *and other development requirements*" for school construction. In that clause, "other development requirements" was clearly meant to include the "charges" and "dedications" mentioned in subdivision

---

[5]"The governing body of a city or county which includes a school district in which special taxes for new school facilities have been approved shall not issue final building permits until such time as the governing board of such district certifies to the governing body that the special taxes have been paid or that arrangements for payment have been made." (Ed. Code, § 43042.) If the building permit nevertheless issues without payment of the special tax, the tax becomes a lien on the property. (*Id.*, § 43043.)

(a) of the same statute. To hold that it includes nothing else—i.e., that it does not include an exaction levied for the very purpose stated in the statute—would be a triumph of form over substance.

It is true that section 65995 does not expressly list "special taxes" among the exactions that it preempts, but this omission may well be explained by reference to history. The problem that the Legislature sought to resolve in section 65995 was caused by increasing school-impact fees, not special taxes. As noted at the outset, the principal reaction of local authorities to the wave of residential development and resistance to rising property taxes in the 1970's was "to impose on developers school-impact fees" (*Candid Enterprises, supra,* 39 Cal.3d 878, 881). Such fees multiplied; special taxes did not, even after the adoption of article XIII A, section 4, because of the supermajority requirement imposed by the constitutional provision. That is why, on the eve of the 1986 legislation that enacted section 65995, we observed that "such special taxes have rarely been imposed, [and] remain novel" (39 Cal.3d at p. 882). In view of their relative rarity and novelty it is not surprising that the Legislature did not expressly list them in section 65995. The omission does not mean that the Legislature did not intend to include such special taxes among the prohibited exactions, but simply that it focused its attention, as it commonly does, on the principal evil to be remedied.

Finally, it is particularly significant that subdivision (f) of section 65995 *expressly* excludes from the statute's reach the class of special taxes that may be levied pursuant to the Mello-Roos Community Facilities Act of 1982.[6] If the Legislature had intended that subdivision (a) of section 65995 exclude *all* special taxes, it would not have expressly excluded *one* class of special taxes, i.e., Mello-Roos taxes, in the same statute. ■ To so read section 65995 would make its subdivision (f) surplusage, and "A construction making some words surplusage is to be avoided." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) ■ From the fact that the Legislature specified one class of special taxes that is not subject to the limitations of section 65995, moreover, we may reasonably infer that it intended that all other classes of special taxes fall within the statute. *Expressio unius est exclusio alterius.* (*Clark* v. *Burleigh* (1992) 4 Cal.4th 474, 489 [14 Cal.Rptr.2d 455, 841 P.2d 975]; *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 196 [132 Cal.Rptr. 377, 553 P.2d 537], and cases cited.)

■ In arguing to the contrary, the District first relies on an opinion by the Legislative Counsel to the effect that in his view the language of section

---

[6]"Nothing in this section shall be interpreted to limit or prohibit the use of [the Mello-Roos Community Facilities Act] to finance the construction or reconstruction of school facilities." (§ 65995, subd. (f).)

65995 was not intended to include "special taxes" imposed pursuant to article XIII A, section 4, of the Constitution. While we give due deference to the opinions of the Legislative Counsel, in this case the opinion is not persuasive. To begin with, we note that the opinion in question is not part of the legislative history of section 65995; it was issued after the statute was adopted, and hence could not have been considered by the Legislature when it was debating the bill that enacted section 65995. It is, rather, a *post hoc* expression of the Legislative Counsel's opinion of what the Legislature meant when it adopted section 65995; and like any such opinion—even that of an appellate court—it is only as persuasive as its reasoning.

In formulating the opinion in question the Legislative Counsel gave no consideration whatever to the reasons we find convincing hereinabove, such as the purposes of the 1986 school financing legislation as a whole and the statute's specific exclusion of Mello-Roos special taxes. Instead the Legislative Counsel relies simply on the abstract distinction between a "development fee" and a "tax" in general. Thus he opines that the "fee, charge, dedication, or other requirement" referred to in section 65995 "means a payment required of a developer for benefits received or burdens created," while a "tax" is "the enforced proportional contribution of persons or property for the support of the government." (Ops. Cal. Legis. Counsel, No. 22732 (Sept. 26, 1986) School Facilities Fees: Special School Taxes, p. 4.) We may agree that a "tax" as thus generally defined is not a fee or other development requirement under section 65995. But that is not the question; the question is whether section 65995 includes a "special tax" like Measure C. And when, as here, the measure is designed to offset the burdens on school financing created by increased residential development, is imposed only on such developers, and is a precondition to obtaining a building permit, whether it is a fee or a special tax it is a "requirement" of development and hence is preempted by section 65995.

The District next relies on the opinion of the author of the legislation that included section 65995. ■ As we recently reiterated, however, in construing legislation "we do not consider the motives or understandings of an individual legislator even if he or she authored the statute." (*Delaney* v. *Superior Court, supra,* 50 Cal.3d 785, 801, fn. 12; accord, *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589 [128 Cal.Rptr. 427, 546 P.2d 1371].)

■ Finally, the District invokes the fact that in 1987 the Legislature failed to pass a bill that would have amended section 65995 to expressly preclude the imposition of special taxes in excess of the statutory cap. ■ Again the rule is settled: "California courts have frequently noted, however, the very limited guidance that can generally be drawn from

the fact that the Legislature has not enacted a particular proposed amendment to an existing statutory scheme. (See, e.g., *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 480, fn. 13 [156 Cal.Rptr. 14, 595 P.2d 592].) As the Court of Appeal explained in *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 58 [69 Cal.Rptr. 480]: 'The unpassed bills of later legislative sessions evoke conflicting inferences. Some legislators might propose them to replace an existing prohibition; others to clarify an existing permission. A third group of legislators might oppose them to preserve an existing prohibition, and a fourth because there was no need to clarify an existing permission. The light shed by such unadopted proposals is too dim to pierce statutory obscurities. As evidence of legislative intent they have little value. [Citations.]'" (*Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 735, fn. 7 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161].)

 The District argues that the Legislature's failure to amend section 65995 implies an intent to adopt the Legislative Counsel's opinion as to the meaning of the statute. We remain unpersuaded. The Legislative Counsel's opinion was couched in very general terms and did not mention the proposed bill, which in any event was not introduced until six months later. That bill, moreover, would have done considerably more than merely redefine the exactions preempted by section 65995: it also proposed a number of substantive changes in the comprehensive revision of the school financing law that had just been enacted in the previous session. In these circumstances it is at least equally likely that the bill was rejected because the Legislature intended to preempt special taxes and believed the wording of section 65995 adequate to do so, or more generally because it did not wish to tamper with this elaborate scheme so soon after its adoption. It is precisely because there is no way of knowing which if any inference is correct that "Unpassed bills, as evidences of legislative intent, have little value." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra,* 43 Cal.3d 1379, 1396.)

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Panelli, J., Kennard, J., Baxter, J., and George, J., concurred.

**ARABIAN, J.**—I dissent. I am unpersuaded by the majority's strained effort to bring special taxes within the purview of Government Code section 65995, subdivision (a),[1] which neither comports with a reasonable interpretation of the statutory language nor finds support in any evidence of legislative intent.

Preliminarily, I disagree in at least one critical respect with the majority's historical survey. In enacting section 65995, the Legislature did not broadly

---

[1] Unless otherwise indicated, all statutory references are to the Government Code.

"reenter[] the field of school financing . . . ." (Maj. opn., *ante*, at p. 917.) Rather, it more narrowly focused its concern on "the subject of financing school facilities *with development fees*" (§ 65995, subd. (e), italics added), i.e., the funding of these educational needs through regulatory police powers, a matter separate and distinct from raising revenue by taxation. Indeed, all the pertinent materials digesting the various provisions of the legislative package speak almost exclusively in terms of fees (see, e.g., Legis. Counsel's Dig., Assem. Bill No. 2926 (1985-1986 Reg. Sess.) p. 2; Conf. Com., Analysis of Assem. Bill No. 2926 (1985-1986 Reg. Sess.) p. 2); the few references to special taxes exclude them from consideration.[2] (E.g., § 65995, subd. (f).)

I also question the majority's postulation of legislative intent. Their initial claim that "section 65995 was an integral part of the Legislature's comprehensive revision of the subject of school financing in 1986" (maj. opn., *ante*, at p. 919) overstates the record considerably. As discussed above, the Legislature limited its attention to a particular method of funding school facilities—development fees. To the extent special taxes require two-thirds voter approval (Cal. Const., art. XIII A, § 4), the Legislature may well have considered that alternative revenue source sufficiently constrained without additional statutory restrictions.

The further claim that section 65995 and its companion legislation "restored" a "balance" "between each district's need to fund school construction caused by residential development and the community's need to ensure an adequate supply of affordable housing" (maj. opn., *ante*, at p. 919) appears made of whole cloth. As evidenced by the majority's lack of citation to authority, this proposition finds no support in either the statutory language or its history.[3]

Moreover, the majority's discussion of the Legislature's purported goals puts the cart before the horse. While the aim of statutory construction is to effectuate legislative intent, the analysis should begin with the terms of the

---

[2] Interestingly, a summary and analysis from the file of Assemblyman Stirling, the bill's sponsor, dated shortly before its passage, states, "The financing package does *not* preclude the possibility of additional voter-approved taxes (such as Prop. 46, Mello-Roos, and Prop. 13 Special taxes) being levied in addition to the capped developer fee."

[3] However, even with legislative endorsement, the majority's premise does not support their conclusion that a *regulatory* statutory scheme necessarily precludes concurrent *taxation*. In *The Pines* v. *City of Santa Monica* (1981) 29 Cal.3d 656 [175 Cal.Rptr. 336, 630 P.2d 521], the city taxed condominium conversions at the rate of $1,000 per unit. Rejecting the argument that the state had preempted the field under the Subdivision Map Act, this court stated, "That the state has preempted a field of statewide concern for purpose of regulation does not itself prevent local taxation of the person or activities regulated. [Citations.]" (*Id.*, at p. 660.) The issues in that case similarly concerned a shortage of available housing and a state effort to regulate in an area subject to local taxation. I see no reason to preclude the exaction here when we allowed the earlier one under comparable circumstances.

enactment itself, which then may be considered in light of any clarifying evidence of such intent. (See *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

Turning to the language of section 65995, subdivision (a), I note the singularly illuminating fact that the Legislature failed to specify "special tax" in an otherwise inclusive listing of preempted exactions. While not dispositive, this omission is significant and requires a convincing explanation to overcome the compelling implication that section 65995 does not affect the validity of special taxes imposed on new developments.

The argument that "charge" or "other requirement" includes special taxes is unsatisfactory for a variety of reasons. First, I find nothing from which to infer the Legislature intended to accomplish indirectly and obliquely what it could easily have done directly and expediently. (See *Peralta Community College Dist.* v. *Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 51 [276 Cal.Rptr. 114, 801 P.2d 357].) I disagree with the implication that our decision in *Associated Homebuilders* v. *City of Livermore* (1961) 56 Cal.2d 847 [17 Cal.Rptr. 5, 366 P.2d 448] somehow equated "charge" with "tax" as a matter of law. (Maj. opn., *ante*, at pp. 919-920.) At best, "charge" is a generic term the precise meaning of which can only be contextual. Here, the statutory scheme focuses on regulatory impositions intended to mitigate the increased burden on facilities caused by new development. (Cf. § 66001.) Taxes, intended solely to raise revenue, perform a distinctly different function. (See *Ingels* v. *Riley* (1936) 5 Cal.2d 154, 159 [53 P.2d 939, 103 A.L.R. 1].) Thus, I find no basis in this case for finding "special tax" subsumed by the statutory reference to "charge."

Second, under the interpretive principle of *ejusdem generis*, "other requirement" does not reasonably include "special tax" either. This doctrine provides that " 'where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. The rule is based on the obvious reason that if the Legislature had intended the general words to be used in their unrestricted sense, it would not have mentioned the particular things or classes of things which would in that event become mere surplusage.' [Citations.]" (*Sears, Roebuck & Co.* v. *San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317, 331, fn. 10 [158 Cal.Rptr. 370, 599 P.2d 676].)

As defined in section 66000, subdivision (b), a development "fee" expressly *excludes* "a tax or special assessment."[4] As discussed above, a "charge" is essentially synonymous with "fee" in this context, generally denoting a cost for services. (See Webster's New World Dict. (3d college ed. 1988) p. 236.) A "dedication" "is the setting apart of land for the public use . . . ." (*People* v. *County of Marin* (1894) 103 Cal. 223, 227 [37 P. 203].) With respect to development projects, a dedication may be in lieu of the payment of other required fees. (See § 65974; see also § 66477.) Each of these specifics, having an underlying regulatory purpose and effect, is a form of exaction wholly dissimilar to an imposition intended principally to raise revenue. Therefore, under the rule of *ejusdem generis* special tax does not come within the general category of "other requirement."

Third, at the time section 65995 was enacted, the significant distinction between regulatory development fees and special taxes had been well drawn by numerous Court of Appeal decisions (e.g., *Trent Meredith, Inc.* v. *City of Oxnard* (1981) 114 Cal.App.3d 317, 325-327 [170 Cal.Rptr. 685]); and we presume legislative awareness of such authority. More importantly, whatever "their relative rarity and novelty" (maj. opn., *ante*, at p. 921), some special taxes had been approved prior to the passage of section 65995. In fact, the Legislature had actual knowledge of Measure C exactions, having provided specific statutory authorization for their collection. (Ed. Code, § 43040 et seq.) In this circumstance, it would have been irrational for lawmakers to omit "special tax" from section 65995 on the assumption it would be construed as within "charge" or "other requirement."

The majority's citation to subdivisions (e) and (f) of section 65995 in support of their construction is unconvincing. Subdivision (e) states a legislative intent to occupy the subject of "development fees *and other development requirements*" respecting school construction. (Italics added.) Reliance on the emphasized language is misplaced for two reasons. First, it disregards legislative material indicating this reference most reasonably contemplates other *regulatory* impositions. For example, a Senate Conference Report on the legislation states, "School districts would not be able to use California Environmental Quality Act (CEQA) *or their general police powers* to extract additional fees." (Conf. Com., Analysis of Assem. Bill No. 2926 (1985-1986 Reg. Sess.) p. 2, italics added.)

Second, it reflects a fundamental misapprehension of the distinction between taxes and regulatory fees as to their purpose and operation, a distinction this case aptly illustrates. Section 53080, subdivision (b), provides that

---

[4]The definitions contained in section 66000 apply to development fees collected pursuant to section 53080, which is incorporated by reference in section 65995. Since the statutes are thus in pari materia, the same interpretive provisions should govern throughout.

no building permit may issue absent certification by the school district that the development project has complied with any fee requirements. By contrast, Measure C special taxes simply become "due and payable" at the time a building permit issues. The record contains no evidence the district or the city conditions issuance on payment. As with other tax indebtedness, it most likely results in a lien on the property. Thus, Measure C does not impose any "development requirements"; it merely attaches a tax surcharge to a particular enterprise or activity, collection of which coincides with regulatory approval.[5] (See *The Pines* v. *City of Santa Monica, supra,* 29 Cal.3d at p. 663.)

As for subdivision (f) of section 65995, it provides, "Nothing in this section shall be interpreted to limit or prohibit the use of [the Mello-Roos Community Facilities Act, authorizing the imposition of certain special taxes,] to finance the construction or reconstruction of school facilities." Accordingly, the majority conclude all other special taxes are preempted: "*expressio unius est exclusio alterius.*" I find nothing so dispositive in this lone reference. Again, the majority fail to explain why lawmakers would choose an indirect rather than direct means of expressing their intent. An equally likely explanation of subdivision (f) lies elsewhere. Under section 53313.5, Mello-Roos Act special taxes may be used to finance "elementary and secondary schoolsites and structures." The Legislature may simply have sought to expressly conform section 65995 to section 53312, which provides that the Mello-Roos Act prevails over any other conflicting provisions of law.

The contention also disregards the Legislative Counsel's opinion concluding that "[i]n view of the significant legal distinction between the terms 'fee' and 'tax,' . . . if the Legislature had intended to include taxes within the scope of the restrictions set forth in Section 65995, that section would have made express reference to taxes."[6] (Ops. Cal. Legis. Counsel, No. 22732 (Sept. 26, 1986) School Facility Fees: Special Taxes, pp. 4-5.) While this

---

[5]The majority also inaccurately imply that Measure C special taxes apply only to new residential development and that the revenue is used only to offset the burden generated by such development. (Maj. opn., *ante,* at p. 922.) On the contrary, *all* persons seeking building permits must pay, irrespective of whether the party is a large-scale developer or an owner-builder constructing a single residence. Moreover, expenditure of proceeds from Measure C is not limited to schools located in new developments but may accommodate the needs of students throughout the district.

[6]Contrary to the majority's claim, this distinction between fees and special taxes is anything but "abstract" (maj. opn., *ante,* at p. 922), as a wealth of court decisions attest. (See, e.g., *Candid Enterprises, Inc.* v. *Grossmont Union High School Dist.* (1985) 39 Cal.3d 878 [218 Cal.Rptr. 303, 705 P.2d 876]; *Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 177 Cal.App.3d 892 [223 Cal.Rptr. 379]; *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227 [211 Cal.Rptr. 567]; *J.W. Jones Companies* v.

opinion may not necessarily reflect the understanding of legislators when enacting the statute, it does considerably inform and illuminate their defeat shortly thereafter of an amendment that would have precluded the imposition of special taxes in excess of the limitations contained in section 65995, subdivision (b). (Assem. Bill No. 1929 (1986-1987 Reg. Sess.) § 4.)[7] As this court has noted, "in some circumstances such legislative inaction may represent a reliable indicant of the intended scope of existing legislation . . . ." (*Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 480, fn. 13 [156 Cal.Rptr. 14, 595 P.2d 592]; see also 2A Sutherland, Statutory Construction (4th ed. 1984) § 49.10.) In light of the view expressed by the Legislative Analyst directly addressing the precise issue so closely in time, the rejection reasonably implies the Legislature did not consider the originally enacted bill to preempt special taxes or desire to rectify the omission. (See *Seibert* v. *Sears, Roebuck & Co.* (1975) 45 Cal.App.3d 1, 19 [120 Cal.Rptr. 233].) The fact that the proposed amendment specifically included special taxes also suggests section 65995, subdivision (a), did not previously contemplate this type of imposition.

Even if the majority were in any respect convincing in their interpretation of subdivisions (e) and (f), I would remain unpersuaded of their ultimate conclusion regarding the scope of section 65665, subdivision (a), considering the substantial body of legislative evidence from which I can discern no intent to preempt local special taxes. On the one hand, the majority's construction of subdivision (a) is superficial and simplistic. On the other, it assumes that in establishing a regulatory scheme the Legislature either ignored or intended to obscure the settled distinction between development fees and related exactions imposed to regulate activity and special taxes enacted simply to raise revenue. (See *The Pines* v. *City of Santa Monica, supra,* 29 Cal.3d at p. 660.)

I cannot accept either the majority's premise or their conclusions. Reading the plain statutory language in light of its history, I find the Legislature well understood the clear implications of omitting "special tax" from section 65995, subdivision (a), and intended that result.

---

*City of San Diego* (1984) 157 Cal.App.3d 745 [203 Cal.Rptr. 580]; *Trent Meredith, Inc.* v. *City of Oxnard, supra,* 114 Cal.App.3d 317; *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974 [156 Cal.Rptr. 777].)

[7]Assembly Bill No. 1929 would have amended section 65995, subdivision (b), to read in part as follows: "In no event shall the amount of any fee, charge, dedication, or other form of requirement, . . . when combined with the amount of any special tax levied upon new construction for the purpose of funding the construction or reconstruction of school facilities . . . exceed [$1.50 per square foot of residential construction]."