*1453
 
 OPINION
 

 Per Curiam:
 

 Appellants, Douglas County Contractors Association, H & S Construction, and Keuper Kustom Homes, Inc., contest the imposition of the “Fair Share Cost” fee by respondents, Douglas County and the Douglas County School District.
 
 [1]
 

 Both Douglas County and the Douglas County School District conducted studies concerning school overcrowding and sought
 
 *1454
 
 and obtained voter approval for a bond issue in excess of 29 million dollars. Douglas County has since expended all of the funds from the bond sales on either new or existing school facilities. Recognizing that the bond issue did not fully meet the School District’s needs, the Douglas County School District and Douglas County hired a consulting firm which developed the Fair Share Cost program.
 

 The Fair Share Cost program was intended to alleviate the pressures exerted upon existing school facilities by expanding enrollments occasioned in part by new development. Pursuant to a mathematical formula based upon anticipated school costs and projected student populations, the Fair Share Cost program would exact a fee in lieu of land on new subdivision development to augment existing facilities and to construct new school facilities throughout Douglas County. The Douglas County School District and Douglas County jointly fashioned an Interlocal Agreement which implemented the Fair Share Cost program.
 

 Appellants challenged the validity of the Fair Share Cost program and sought declaratory and injunctive relief. Following extensive briefing and cross-motions for summary judgment, the district court upheld the legality of the program.
 

 In a case of first impression, we are asked to decide whether the Legislature occupies the field of funding for school capital improvements and thus preempts the Fair Share Cost program. We conclude that respondents, as local political subdivisions of the State of Nevada, lack the authority to impose such a program. Accordingly, the district court’s entry of summary judgment in favor of respondents is reversed and this matter is remanded with instructions to enter judgment in favor of appellants.
 

 FACTS
 

 Appellants H & S Construction and Keuper Kustom Homes (“Contractors”) are Nevada contractors who primarily are engaged in the business of constructing single-family residences. Appellant, Douglas County Contractor’s Association (“DCCA”), is a nonprofit corporation whose members are mostly general contractors in the business of residential construction. Respondent Douglas County (“County”), is a political subdivision of the State of Nevada which acts by and through respondent, the Board of County Commissioners of Douglas County (“the Commissioners”). Respondent Douglas County School District (“School District”), is a political subdivision of the State of Nevada and is governed by respondent, the Board of Trustees of the Douglas County School District (“Board of Trustees”).
 

 Recognizing that school overcrowding had become a critical
 
 *1455
 
 concern, the School District began conducting studies in late 1990 to pursue alternatives for alleviating the pressures exerted on existing school facilities. The County and the School District negotiated an Interlocal Agreement to formulate a procedure for imposing a fee to be included in new residential subdivision development agreements. The County then ratified the Interlocal Agreement as Ordinance 596.
 

 In order to implement the Interlocal Agreement, the School District hired a consultant to “. . . assist the District in the adoption of a capital facilities plan for school facilities and . . . prepare an impact fee analysis which incorporates fair share school facilities costs.” After crediting each dwelling unit for the Residential Construction Tax of $1,000
 
 [2]
 
 and the debt service on outstanding bonds, the consultant arrived at a net adjusted fair share cost of approximately $2,400 per dwelling unit. The County and the School District agreed on this figure and pursuant to a vote, the Fair Share Cost (“FSC”) program became effective on September 2, 1993.
 

 In May, 1992, Douglas County voters approved a bond issue in excess of $29 million which was quickly exhausted on new and existing school facilities. Recognizing a need for additional funding, the Commissioners lobbied the 1993 and 1995 sessions of the Nevada Legislature for an increase in the Residential Construction Tax to be used for school construction. If passed and approved, this legislation would have tripled the current ceiling of $1,000 on the Residential Construction Tax as authorized by NRS 387.311.
 
 [3]
 
 The 1993 bill “died” in committee and the identical 1995 bill was indefinitely postponed.
 

 The County has charged, and continues to charge the maximum allowable Residential Construction Tax of $1,000 — one of only two counties in Nevada which levy this tax. The FSC program applies strictly to subdivision development.
 

 Las Vegas Paving, Inc. (“LVP”) entered into a development agreement with the County to develop the Sunridge Heights subdivision in Douglas County. Approval of the Sunridge Heights subdivision development was conditioned on the County’s ability to impose rules, regulations, and ordinances on residential construction as mitigating measures for the School District. In April 1993 the Contractors executed a written agreement with LVP to purchase numerous lots, subject to the applicable zoning, building, and development regulations in the Sunridge Heights subdivision.
 

 
 *1456
 
 The first lots purchased by the Contractors were not subjected to the FSC because the ordinance approving the FSC program had not yet passed; however, in October 1993, following approval of the ordinance, the County began imposing the FSC. The residential building permits were issued only on the condition that the Contractors pay the FSC fees. When H & S Construction refused to pay the FSC fees for two lots in the Sunridge development, the County refused to issue building permits.
 

 The FSC program does not apply to any current construction on residential lots in the Tahoe Basin because Ordinance 596 was not in effect when those subdivisions were approved. However, all future subdivisions within the Douglas County portion of the Tahoe Basin are subject to the FSC. The FSC also does not apply to commercial developments, lots created by the parcel map process, or divisions of land into large parcels.
 

 DISCUSSION
 

 The nature of the FSC program
 

 The proper characterization of respondents’ FSC program is outcome determinative; this threshold issue therefore supplies the springboard for our analysis. Whether Ordinance 596 is a regulatory measure or a tax is a critical question. Appellants contend that while it is within the County’s power to impose certain regulatory fees, the County is without power to impose the FSC as a tax measure under its police power.
 

 Appellants insist that the FSC is really an “impact fee” which embodies all of the indicia of a tax because it is designed to raise revenue for schools. As support for this proposition, appellants direct our attention to the parties’ stipulation of facts wherein the FSC is referred to as the “adoption of the Fair Share
 
 Fee.
 
 ”
 

 Nevada’s “impact fee” legislation was enacted in 1989 and codified in NRS Chapter 278B. NRS 278B.050 defines an impact fee as follows: “ ‘Impact fee’ means a charge imposed by a local government on new development to finance the costs of a capital improvement or facility expansion necessitated by and attributable to the new development. The term does not include a tax for the improvement of transportation imposed pursuant to NRS 278.710.”
 

 Respondents contend that since Ordinance 596 requires contractors to dedicate land or pay a fee in lieu of dedication, it must be properly viewed as regulatory in nature. Relying heavily upon Trimen Development Co. v. King Co., 877 P.2d 187, 192 (Wash. 1994), respondents advance the proposition that the FSC is not a tax because its primary purpose is regulatory rather than revenue-
 
 *1457
 
 raising. In
 
 Trimen,
 
 the court upheld the validity of a park development fee in lieu of plat approval. The court concluded that the county’s fee was a regulation and not a tax.
 
 Id.
 
 at 192. Respondents urge that even if the FSC imposes burdens or charges, it cannot be characterized as a tax because its primary purpose is to regulate, not to raise revenue.
 

 Appellants’ response is twofold. First, as the discussion that follows illustrates, the FSC is a tax, not a regulatory device. Second, unlike the Revised Code of Washington, the Nevada Revised Statutes do not provide an analogous grant of authority to require dedication of land or payment in lieu of dedication. Appellants note that the
 
 Trimen
 
 court grounded its decision in the Revised Code of Washington, Section 82.02.020, which authorized the county to impose the fee.
 
 Id.
 
 at 191.
 

 In Southern Nevada Life v. City of Las Vegas, 74 Nev. 163, 166, 325 P.2d 757, 758 (1958), this court was asked to distinguish between regulatory fees and revenue taxes. In resolving the issue, we were guided by
 
 McQuillan on Municipal Corporations,
 
 Vol. 9, sec. 26.15, page 26:
 

 On the one hand, a tax that is not in any sense regulatory and is imposed expressly for general revenue purposes is not a license tax. A so-called license fee or tax imposed for revenue is in truth a tax and not a license exaction under the police power. . . . Thus, a declared or obvious purpose to regulate tends to establish an exaction as a purely licensing and regulatory fee. But an ordinance having no provisions for regulation and imposing an exaction is a tax ordinance designed to raise revenue. When levied for revenue alone, so-called license fees or license taxes are revenue taxes.
 

 Two cases from other jurisdictions further illuminate the distinction between a regulatory fee and a tax. In Eastern Diversified v. Montgomery County, 570 A.2d 850, 854 (Md. 1990), the court noted:
 

 In evaluating whether a development impact fee is a regulatory charge or a tax,
 
 the purpose of the enactment governs rather than the legislative label. ... In general, it may be said that when it appears from the Act itself that revenue is its main objective, and the amount of the tax supports that theory, the enactment is a revenue measure.
 

 (Emphasis added.)
 

 A Washington court also adopted this distinction: “If the fees are merely tools in the regulation of land subdivision, they are not taxes.
 
 If,
 
 on the other hand,
 
 the primary purpose of the fees is to raise money,
 
 the fees are not regulatory, but fiscal, and
 
 they are
 
 
 *1458
 

 taxes.”
 
 Hillis Homes, Inc. v. Snomish County, 650 P.2d 193, 195 (Wash. 1982) (emphasis added).
 

 Appellants emphasize that the Ordinance,
 
 [4]
 
 Joint Resolution, Final Report, and the Interlocal Agreement between the County and the School District, uniformly reflect that the FSC is intended to generate revenue to fund school construction. In its Final Report, the consulting firm hired by the School District and the County concluded that “[t]he School District
 
 must generate revenue
 
 in the amount of the FSC for each new residential unit in order to provide sufficient capital facilities to educate the number of students that the unit will produce.” (Emphasis added.) Apparently, respondents intend to use the FSC funds anywhere in Douglas County according to their capital improvements plan; the funds do not appear to be earmarked for or limited to use in the Sunridge Heights subdivision.
 

 The consultant suggested three alternatives to generate revenue: (1) respondents could use the FSC as evidence of the need to raise the ceiling on the Residential Construction Tax per dwelling unit;
 
 [5]
 
 (2) the FSC could be used as leverage in obtaining enabling legislation for school impact fees to be levied by respondents; or (3) the County could rely on the FSC as a standard in negotiating development agreements thereby requiring land, facilities, or fees in lieu of development approval.
 

 The “revenue generating” language within the Interlocal Agreement and the Joint Resolution is not as explicit. Both establish guidelines that the County and School District must follow in their quest to acquire school sites, cash contributions, and development agreements. However, the language impliedly suggests the need to generate revenues.
 

 Respondents pursued each of the suggestions enumerated in the Final Report, but failed in two attempts to have the Legislature increase the maximum Residential Construction Tax available under NRS 387.331.
 
 [6]
 
 Appellants note that Douglas County is one of only two counties in Nevada which impose this tax, and that
 
 *1459
 
 the County is currently imposing the tax at the $1,000 ceiling. Respondents sought, through the Legislature, to triple the statutory limit of $1,000 imposed under NRS 387.331, and then initiated the FSC program after failing to secure relief from the 1993 legislative session.
 

 As an alternative to the Residential Construction Tax, the consultants urged the School District to pursue legislation enabling them to levy school impact fees. This suggests that the consultants did not believe that respondents possessed the authority to levy the FSC. According to the consultants, the California Legislature has enacted school impact fee legislation authorizing school districts to levy such fees as a condition of development approval. However, Nevada has not enacted such legislation.
 

 The Final Report acknowledged the critical distinction between regulatory fees and taxes: “Unlike the residential construction tax, school impact fees are regulatory in character
 
 and can only be used to add school capacity that benefits new development. ”
 
 (Emphasis added.)
 

 Appellants contend that the FSC is utilized to benefit Douglas County at large rather than the Sunridge Heights subdivision. Appellants also argue that since the fee has all of the indicia of an assessment against each dwelling unit, it is an impact fee which fits squarely within the definition of NRS 278B.050. As such, respondents are limited by statute as to the capital improvements that can be financed by the fee. We agree.
 

 We conclude that any regulatory features of the FSC are incidental to its true purpose — to raise revenue to finance construction benefitting the County at large and not simply the subdivision at issue. The FSC is clothed with the indicia of a tax rather than a regulatory measure. Respondents’ characterization of the FSC as regulatory rather than a revenue-generating tax is untenable. Therefore, the district court erred in holding that the FSC program is not an impact fee or impermissible tax.
 

 Statutory authority
 

 Respondents cite a number of statutes which purportedly enable them to impose the FSC on selected new development. The County also relies heavily on authority from other jurisdictions as support for its ability to impose the FSC.
 

 
 *1460
 
 Our review of the cited statutes and cases from other jurisdictions leaves us with the conclusion that none of them can be contorted to provide support for respondents’ position. The cited statutes are inapposite and the cases are readily distinguishable, and in any event do not provide a basis for superseding Nevada controlling case authority.
 

 We view as dispositive our recent decision in Southern Nevada Homebuilders Association v. City of North Las Vegas, 112 Nev. 297, 913 P.2d 1276 (1996). There we considered the validity of a North Las Vegas ordinance requiring payment of fees based upon the square footage of new development, to be used to finance a portion of the city’s emergency medical services and fire protection.
 

 The City of North Las Vegas argued that NRS 278B.160
 
 [7]
 
 provided the authorization to impose its impact fee even though the projects to be benefitted were not enumerated under the statute. The City contended that the statute was not exclusive. This court disagreed and concluded that “the language of NRS 278B is clear on its face, allowing impact fees only for the enumerated projects. However, even if NRS 278B were considered ambiguous, the legislative history of the statute clearly reflects an intent to restrict the projects for which impact fees could be imposed.”
 
 Id.
 
 at 301, 913 P.2d at 1279.
 

 In so holding, this court confined its analysis to the statute’s language and legislative history. As a threshold inquiry, the
 
 Southern Nevada Homebuilders Association
 
 court considered the statutory definitions of “impact fee” and “capital improvement.” Under NRS 278B.050, an “ ‘[ijmpact fee’ means a charge imposed by a local government on new development to finance the costs of a capital improvement or facility expansion[
 
 8
 
 ] necessitated by and attributable to new development.” NRS 278B.020 defines “capital improvement” as a “1. Drainage project; 2. Sanitary sewer project; 3. Storm sewer project; 4. Street project; or 5. Water project.”
 

 In researching the legislative history concerning the reach of impact fees, we determined that the list of capital improvements for which impact fees could be used is
 
 exclusive. Southern
 
 
 *1461
 

 Nevada Homebuilders Association
 
 at 301, 913 P.2d at 1279. Appellants contend, and we agree, that the imposition of the FSC is improper because NRS 278B fails to include school site acquisition among the list of permissible capital improvements.
 

 Respondents discount
 
 Southern Nevada Homebuilders Association
 
 on the premise that the FSC is not an “impact fee.” It is evident, of course, why respondents have characterized the FSC as either a “contract,” “regulatory fee,” or “fee in lieu of land dedication.” To label the FSC as an “impact fee” or “tax” would place it squarely under the prohibitive purview of Chapter 278B. Nevertheless, respondents have not provided a cogent basis for characterizing the FSC as anything other than what it is — a tax or impact fee. Moreover, if we were to accept respondents’ position, we would render essentially meaningless the constraints purposely written into Chapter 278B by the Legislature.
 

 Respondents attempt to make an end run around Chapter 278B by resorting to NRS 244.357(1) and (2)
 
 [9]
 
 as general police power authority for the FSC program. Although the district court agreed, we must conclude otherwise. This court has held that while the state can delegate its police power and power to tax to its political subdivisions, “[s]uch power is granted only where the grant plainly appears from the delegating statute.” Clark Co. v. Los Angeles City, 70 Nev. 219, 221, 265 P.2d 216, 217-18 (1954).
 

 The district court also identified additional specific grants of police power in provisions such as NRS 278.020(1); 278.0201-0207; 278.0226; 278.185, 278.250(2)(f) and (i); 278.346 and 278.349(3)(d). Although we have determined that none of these statutes provides support for Ordinance 596, we will briefly address those statutes that may appear to have remote application to the situation before us.
 

 Respondents’ interpretation of NRS 244.357 is unavailing because the statute addresses issues associated with police, sanitary and traffic ordinances. Despite the statute’s limited focus,
 
 *1462
 
 respondents declare “[legislation like the state statute just cited grants the county police powers as extensive as that of the legislature so long as the subject matter does not conflict with general laws.”
 

 In Wilkinson v. Bd. of County Comm’rs of Pitkia County, 872 P.2d 1269 (Colo. App. 1993), the court dealt with traditional zoning issues involving subdivisions and parcelling of property as opposed to impact fees. Unlike the instant case and Nevada’s statutory composition, the
 
 Wilkinson
 
 court acknowledged that the applicable Colorado statute provided a broad grant of authority to political subdivisions in regulating and planning the use of their land.
 
 Id.
 
 at 1276.
 

 As a fallback position, respondents rely on the planning and zoning statutes codified in NRS Chapter 278 as the legislative imprimatur for imposing the FSC. Respondents’ reliance on these statutes is equally unavailing. By way of illustration, NRS 278.0201 defines the parameters of an agreement between a governing body and a person having a legal or equitable interest in the land at issue. By definition, the agreement is limited in scope to land uses. The statute also addresses a governing body’s ability to adopt any future modifications or regulations. The statute would confine a future resolution or regulation to permitted uses of the land, density, design, and construction.
 

 Respondents’ claim that the statute grants them revenue-raising capabilities bears little relation to the statute’s language. NRS 278.0201(2) proscribes imposing ordinances or regulations applicable to the land
 
 after
 
 an agreement has been reached.
 

 However, NRS 278.0201(3) would allow the County to adopt new regulations applicable to the land provided they are not in conflict with those in existence when the agreement is made. Appellants argue, and rightfully so, that the absence of a “non-conflicting” regulation such as the FSC, at the time the Development Agreement for Sunridge Heights was made, trumps the County’s ability to add the additional terms of the FSC.
 
 [10]
 
 The FSC does not fit within any of these statutory criteria; therefore, NRS 278.0201 does not provide respondents with the authority to contractually require land dedications or any variant thereof.
 

 NRS 278.185 is equally inapposite. This statute deals with notice of plans for future school construction. Another statute relied upon by the district court and appellants which purportedly
 
 *1463
 
 provides a specific grant of police power to impose the FSC is NRS 278.250(2)(f) and (i):
 

 2. The zoning regulations must be adopted in accordance with the master plan for land use and be designed:
 

 (f) To develop a timely, orderly and efficient arrangement of transportation and public facilities and services, including facilities and services for bicycles.
 

 (i) To promote health and the general welfare.
 

 A cursory review of this statute reveals no basis for accepting it as a grant of authority for respondents to impose the FSC or any variation thereof to finance schools. Respondents’ reliance on this statute is without merit.
 

 Equally without merit is the attempt to validate the FSC under the provisions of NRS 278.346 and NRS 278.349(3)(d). These statutes in unison provide for the dedication of school sites as a condition of approval if a school site is needed. The Legislature, however, has required the acquiring school district to pay the owner of the site the fair market value of the property. Neither statute contains language which, by any stretch of the imagination, grants respondents the authority to raise revenue by charging developers fees in lieu of land dedication.
 

 Even respondents acknowledge the shortcomings in relying on these two statutes: “this method is site-specific to a particular subdivision . . . .” Thus, we conclude that respondents have failed to summon any statutory support which clothes them with the general police power to impose the FSC against developers. Such an interpretation would collide with the strict limitations placed upon political subdivisions by the Legislature.
 

 Legislative intent
 

 In Kuban v. McGimsey, 96 Nev. 105, 605 P.2d 623 (1980), we stated that in determining whether the Legislature intended to occupy an entire field, “we must look to the ‘whole purpose and scope of [the] legislative scheme.’ ”
 
 Id.
 
 at 111, 605 P.2d at 626 (quoting Lamb v. Mirin, 90 Nev. 329, 332-33, 526 P.2d 80, 82 (1974)).
 
 See also
 
 Flick Theater v. City of Las Vegas, 104 Nev. 87, 89-90, 752 P.2d 235, 237 (1988) (in determining whether Legislature intends to exclusively occupy a particular field, “courts should look to the whole purpose and scope of the legislative scheme”).
 

 
 *1464
 
 In
 
 Flick,
 
 we upheld the enforcement of local ordinances which restricted the operation of sexually-oriented businesses. In our ruling, we determined that there was no indication of a comprehensive legislative scheme to fully occupy the regulation of sexually-oriented businesses.
 
 Id.
 
 at 90, 752 P.2d at 237.
 

 The case at bar is distinguishable from
 
 Flick.
 
 In
 
 Flick,
 
 this court recognized that the Legislature did not intend to occupy the field of sexually oriented businesses. Conversely, in the instant case, the three statutory chapters devoted to school funding provide compelling evidence that the Legislature intended to exclusively occupy this particular field. Thus, if local political subdivisions were intended to have unfettered discretion in devising their own school funding schemes, the Legislature would have made explicit provision for such authority.
 

 Respondents cite to Grupe Development Co. v. Superior Court, 844 P.2d 545 (Cal. 1993), as support for finding broad police powers within the Nevada statutes which would validate respondents’ imposition of the FSC. Again, their reliance is misplaced. Contrary to respondents’ interpretation, the California Supreme Court held that the “special tax” levied by a school district on all new residential construction was preempted by California’s comprehensive school legislation scheme.
 
 Id.
 
 at 546. In so holding, the court noted that “the Legislature hereby
 
 occupies the subject matter of mandatory development fees and other development requirements
 
 for school facilities finance
 
 to the exclusion of all local measures on the subject.” Id.
 
 at 549. Clearly, this ruling would prohibit an extension of authority to the school districts to impose impact fees similar to the FSC under a general police power theory. Appellants maintain that Nevada’s broad and comprehensive legislative scheme for the operation and funding of schools is evidence of the state Legislature’s exclusive occupation of this subject matter. As support for the proposition that the independence and authority of political subdivisions is statutorily limited in this area, appellants cite three comprehensive chapters in the Nevada Revised Statutes addressing the subject of financial support for Nevada’s school system: NRS Chapter 387, “Financial Support of School System;” NRS Chapter 278B, “Impact Fees for New Development;” and NRS Chapter 374, “Local School Support Tax.”
 

 Under Nevada’s current statutory scheme, school funding is accomplished in several ways. NRS 387.331 (Residential Construction Tax) permits the smaller counties to levy a residential construction tax not to exceed $1,000 per residential unit.
 
 [11]
 
 NRS
 
 *1465
 
 387.3285 (Ad Valorem Tax) enables boards of county commissioners to levy an additional ad valorem tax, but only after voter approval by a majority of the registered voters in the county. Another funding vehicle is the issuance of general obligation bonds by the school district’s board of trustees.
 
 See
 
 NRS 387.335. Clearly, the Legislature has scrupulously addressed this subject matter, yet impact fees as a vehicle for school funding are conspicuously absent.
 

 In its decision, the district court concluded that:
 

 The Court finds nothing in the portion of Chapter 387 of the Nevada Revised Statutes relating to the financing of construction of schools (NRS 387.329
 
 et seq.)
 
 or the issuance of bonds (NRS 387.335
 
 et seq.)
 
 which specifically prohibits implementation of an in-lieu of dedication payment program like the FSC. These provisions in Chapter 387 of the Nevada Revised Statutes do not preempt the FSC program at issue in this litigation because the program is predicated on other provisions found in Chapters 244 and 278 of the Nevada Revised Statutes.
 

 As the district court mentions, the Legislature has explicitly delegated a variety of fund-raising schemes for its political subdivisions. However, to conclude that respondents have the implied power to impose the FSC in the absence of an express legislative dispensation runs counter to, and would be disruptive of the “whole purpose and scope of the legislative scheme.”
 
 Flick,
 
 at 90, 752 P.2d at 237.
 

 If this court were to adopt respondents’ reasoning, the entire body of exhaustive legislation dealing with school funding in Nevada would be relegated to the status of a partial funding mechanism accommodating the proliferation of a variety of revenue-generating measures of unplanned proportions imposing an unpredictable effect on tax planning, revenue source allocations, and the statewide tax structure.
 
 [12]
 

 For the above reasons, we conclude that the Nevada Legislature has carefully planned the means of orderly school financing within a statutory scheme structured to occupy the entire field on the subject. Thus, the FSC program has been preempted by Nevada’s impact fee enabling legislation, and the district court erred in ruling to the contrary.
 

 
 *1466
 
 Although appellants have raised issues concerning the constitutionality of the FSC, given our disposition of this matter it is unnecessary to address the constitutional issues. We have carefully considered all remaining points raised by the parties and conclude either that they are without merit or that they need not be addressed in the disposition of this appeal.
 

 CONCLUSION
 

 For the reasons discussed above, we reverse the summary judgment entered by the district court in favor of respondents and remand with instructions to grant appellants’ motion for summary judgment.
 

 [1]
 

 The amici curiae filing briefs in support of appellants’ positions are the Nevada Taxpayers Association, the Nevada Homebuilders Association, the Builders Association of Northern Nevada, the Western Nevada Home-builders Association, and the Southern Nevada Homebuilders Association.
 

 [2]
 

 See n.6.
 

 [3]
 

 See n.6.
 

 [4]
 

 Ordinance No. 596 approved the Interlocal Agreement between the County and the School District and provided guidelines “for the establishment and collection of financing for capital facilities required by the District.”
 

 [5]
 

 This suggestion apparently would be a predicate upon which respondents could seek legislative relief.
 

 [6]
 

 NRS 387.331 provides in pertinent part:
 

 387.331 Imposition of tax for construction, remodeling and additions for school buildings in district whose population is less than 35,000; limitation on amount; deposit of proceeds in fund for capital projects.
 

 1. The tax on residential construction authorized by this section is a specified amount which must be the same for each:
 

 
 *1459
 
 (a) Lot for a mobile home;
 

 (b) Residential dwelling unit;
 

 3. If the board of county commissioners decides that the tax should be imposed, it shall notify the Nevada tax commission. If the commission approves, the board of county commissioners may then impose the tax, whose specified amount must not exceed $1,000.
 

 [7]
 

 NRS 278B.160 provides that “[a] local government may by ordinance impose an impact fee in a service area to pay the cost of constructing a capital improvement or facility expansion necessitated by and attributable to new development. ...”
 

 [8]
 

 “Facility expansion” is defined under NRS 278B.040 as “the expansion of the capacity of an existing facility associated with a capital improvement to serve new development. The term does not include the repair, maintenance or modernization of a capital improvement or facility.”
 

 [9]
 

 In pertinent part, NRS 244.357 provides:
 

 244.357 Police, sanitary, loitering, prowling and traffic ordinances: Enactment and enforcement.
 

 1. Each board of county commissioners may enact and enforce such local police and sanitary ordinances and regulations as are not in conflict with the general laws and regulations of the State of Nevada
 

 2. Such police and sanitary ordinances and regulations may be enacted to apply throughout an entire county or, where the subject matter makes it appropriate and reasonable, may be enacted to govern only a limited area within the county which must be specified in the ordinance.
 

 [10]
 

 The Development Agreement for Sunridge Heights was passed by ordinance on February 18, 1993. The FSC established through the Interlocal Agreement became effective on July 22, 1993.
 

 [11]
 

 See
 
 n.6.
 

 [12]
 

 Indeed, the Legislature has even controlled the availability of the residential construction tax by requiring counties seeking to impose the tax to first secure the approval of the Nevada tax commission. This strongly indicates the intent of the Legislature to carefully monitor the extent to which taxes are employed to construct, remodel and provide additions to school buildings. NRS 387.331(3).