Filed 8/24/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| WEST COAST UNIVERSITY, INC., | |
| Plaintiff and Appellant, | C094077 |
| v. | (Super. Ct. No. 34-2020-80003378-CU-WM-GDS) |
| BOARD OF REGISTERED NURSING et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Steven M. Gevercer, Judge. Affirmed.

Bryan Cave Leighton Paisner, K. Lee Marshall, Daniel T. Rockey and Jean-Claude André for Plaintiff and Appellant.

Rob Bonta, Attorney General, Carl W. Sonne, Senior Assistant Attorney General, Joshua A. Room, Andrew M. Steinheimer, Supervising Deputy Attorneys General, and Brent O. Jex, Deputy Attorney General for Defendants and Respondents.

1

The California Board of Registered Nursing (the Board) is a state agency charged with overseeing nursing practice and nursing schools in California. One of its regulations governing nursing schools states: "An approved nursing program shall not make a substantive change without prior board authorization." (Cal. Code. Regs., tit. 16, § 1432, subd. (b).)[1] The regulation adds that such changes include a change in location, a change in ownership, an addition of a new campus or location, and, for certain nursing programs, a significant change in the agreement between the nursing program and the institution of higher education with which it is affiliated.

In this case, the Board determined that West Coast University, Inc. (West Coast) made a substantive change under the regulation when it increased its annual student enrollment from 500 to 850 over a five-year period. After West Coast sought a writ of mandate, the trial court denied each of West Coast's claims and entered judgment in favor of the Board and its executive officer.

The principal question before us is whether the Board could consider the change in enrollment to be a substantive change under the regulation, even though a change in enrollment is not one of the examples of a substantive change listed in the regulation and even though the Board, at the time it adopted its regulation, considered but declined to list a change in enrollment as one of the examples.

We conclude the Board could consider the change in enrollment to be a substantive change under the regulation. Accordingly, we will affirm the judgment.

BACKGROUND

A

The Nursing Practice Act (Bus. & Prof. Code, § 2700 et seq.) tasks the Board with approving and overseeing nursing schools in California (*id.*, §§ 2785-2789). Under the

---

[1] Undesignated regulatory references are to this title.

act, the Board is responsible for granting initial approval of nursing programs (*id.*, § 2786, subd. (a)) and granting continuing approval of those programs "that meet the requirements provided by the board" "at such times as the board shall deem necessary" (*id.*, § 2788).  The act also gives the Board the authority to "adopt, amend, or repeal, in accordance with the Administrative Procedure Act . . . , the rules and regulations that may be reasonably necessary to enable it to carry into effect" the provisions of the act. (*Id.*, § 2715, subd. (c).)

Relying on its rulemaking authority under the act, the Board has adopted various regulations governing approval and oversight of nursing schools.  (§ 1420 et seq.)  One of the regulations is section 1432.  Subdivision (b) of this regulation states:  "An approved nursing program shall not make a substantive change without prior board authorization. These changes include:  [¶]  (1) Change in location.  [¶]  (2) Change in ownership.  [¶] (3) Addition of a new campus or location.  [¶]  (4) Significant change in the agreement between an approved nursing program that is not an institution of higher education and the institution of higher education with which it is affiliated."

Section 1432 has remained in its current form since 2010.  Before the Board approved this language, however, Board staff initially recommended that the Board adopt a slightly different version of section 1432, subdivision (b), that included five examples of substantive changes.  These examples included the four listed in the regulation today along with one other:  "Change in admission or enrollment pattern that will significantly increase the number of enrolled students."  But the Board's Education/Licensing Committee (the Committee)—which advises the Board on education and licensing matters—advised against including this language, and the Board ultimately followed its recommendation.

Neither the Committee nor the Board explained their reasoning for omitting this language.  But according to the minutes for the Committee meeting, although the Committee recommended omitting this language, it agreed that Board approval should

3

nonetheless be required before certain nursing programs increase their enrollment. After Board staff sought to clarify the reasons for the suggested modifications—stating that the focus of concerns was related primarily to a newly approved program, without a track record, that expanded beyond the Board's approved program without Board approval— the Committee agreed that Board approval should be required before newly approved nursing programs increased their enrollment. But rather than include this requirement in the text of the regulation, the Committee instructed staff to "[i]nclude the requirement for notifying the Board in the initial approval letter that a Board approval is needed when a newly approved nursing program makes any changes in the Board approved program, such as increasing enrollment numbers."

B

West Coast is a private postsecondary educational institution that specializes in educating and training bachelor-credentialed nurses. It has nursing programs in three locations in California: Los Angeles, Anaheim, and Ontario. The Board initially approved West Coast's Los Angeles program in 2005, its Anaheim program in 2007, and its Ontario program in 2008.

In 2013, the Board reviewed West Coast's Los Angeles and Anaheim programs for continuing approval. Before granting continuing approval for any nursing program, Board staff conducts a site visit and prepares a written report of findings. The Committee afterward makes recommendations based on these findings, and the Board ultimately makes the final decision on approval. During the 2013 review for West Coast, Board staff found that West Coast's programs had evolved from operating as three independent nursing programs to "operating as one institution . . . consisting of three . . . nursing programs." The Committee afterward found this organizational change qualified as a type of "substantive change" that required prior Board approval. The Committee also found West Coast's student enrollment grew since 2005 but, unlike the organizational change, it did not characterize this growth as a type of change that required prior

4

approval. After West Coast requested approval for its organizational change, the Board approved the change and then granted West Coast continuing approval.

A few years later, in 2016, the Board issued a set of guidelines, the 2016 Guidelines, on its approval criteria for nursing programs. The guidelines stated that "[t]o become approved and to continue to be approved, a nursing program shall . . . meet[] the criteria stated in this document." The guidelines then, as relevant here, stated that a nursing program must obtain prior Board approval before making any "substantive change" and noted nine examples of a substantive change, which included the four examples listed in the regulation and five new examples. Among the new examples was one stating that a substantive change includes "[a]n increase or decrease in the number of student enrollments; or changes in enrollment cycles, previously approved by the board." The Board offered no explanation for including this new example, which largely mirrored the language the Board decided to omit when it adopted section 1432 in 2010.

In 2018, the Board again reviewed West Coast's program for continuing approval. As in the 2013 review, Board staff found that West Coast's student enrollment had grown. But this time, rather than simply acknowledge the growth, the Committee concluded that West Coast's growth was a substantive change under section 1432, subdivision (b). Compared to the 2013 review, West Coast's annual student enrollment had increased by 350 (from 500 students per year in 2013 to 850 students per year in 2018) and its total student enrollment had increased by over 1,300 (from 1,800 students in 2013 to 3,139 students in 2018). In a 2-1 vote, the Committee recommended that the Board grant continuing approval only if West Coast agreed to reduce its enrollment to 2013 levels within six months of receiving approval. The two members who favored this recommendation appeared to have concerns that West Coast's growth had increased competition for limited clinical opportunities and, as a result, adversely impacted students in other nearby programs. According to the Committee's minutes, the Committee asked 22 nursing programs in the counties of Los Angeles, Orange, Riverside, and San

5

Bernardino "if their program had experienced clinical displacement by [another nursing] program and if so if they were aware of which . . . program caused the displacement." Four programs (nearly 20 percent) responded that they experienced clinical displacement in part because of West Coast. The dissenting member on the Committee appeared to reject her colleagues' reading of section 1432. Although no explanation for her dissent appears in the Committee minutes, at an earlier meeting concerning West Coast's continuing approval, she read section 1432 and said there was no requirement for enrollment increases.

The same day the Committee issued its recommendation on West Coast, the Board delegated to its executive officer the authority to withdraw the 2016 Guidelines. A few weeks later, pursuant to this delegation, the Board's executive officer certified that the Board would "withdraw and otherwise not issue, use, enforce, or attempt to enforce the use of" the 2016 Guidelines. The Board opted to withdraw its guidelines after an association of private postsecondary schools filed a petition with the Office of Administrative Law challenging the guidelines. The association contended the guidelines functioned as a regulation in that they served to amend section 1432 but, in violation of state law, were not adopted through the procedures required for regulations. It then asked the Office of Administrative Law —which has authority to issue a finding that an agency guideline is in fact a regulation—to find that the 2016 Guidelines operated as an underground regulation. (See Gov. Code, § 11340.5; Cal. Code Regs., tit. 1, §§ 250, 260.) In response to the petition, and before the Office of Administrative Law issued any decision, the Board decided to withdraw its guidelines.

Following the Board's withdrawal of its guidelines, West Coast sent a letter to the Department of Consumer Affairs, the department in which the Board is housed. (See Bus. & Prof. Code, § 2701, subd. (a).) West Coast asserted in its letter that the Board's withdrawal of the guidelines showed "there is no statutory basis for continuing to withhold [West Coast's] reauthorization." But the Department of Consumer Affairs

6

disagreed. It stated that the Board remained confident in its interpretation, which it said was based on its interpretation of section 1432, subdivision (b). (See Bus. & Prof. Code, § 2701, subd. (a).) It then explained that the Board regarded West Coast's enrollment increase to be a substantive change because it was a material enrollment increase, suggesting a departure from the 2016 Guidelines' approach of treating all enrollment increases, not just material ones, as substantive changes. It added that there was no material harm to West Coast while the Board contemplated its continuing approval and that, unless the Board expressly revokes West Coast's approval, West Coast could continue to operate indefinitely. As of this date, the Board has neither acted on the Committee's recommendation for West Coast's continuing approval nor moved to revoke West Coast's approval to operate.

C

A year after receiving the Department of Consumer Affairs' letter, West Coast filed a petition for writ of mandate against the Board and its executive officer, Loretta Melby, seeking the following: to compel the Board to grant West Coast continuing approval, a judicial declaration that the Board's interpretation of section 1432 is an underground regulation, and a judgment that the Board's application of section 1432 to West Coast is unconstitutionally vague in violation of the Fourteenth Amendment's due process clause. Relevant to all its allegations, West Coast argued that nothing in section 1432 requires nursing schools to seek Board approval before increasing their student enrollment.

The Board, in opposition, disputed West Coast's reading of section 1432 and challenged West Coast's right to receive the relief it requested. It raised four general arguments. First, it contended West Coast had no right to an order compelling the Board to act on West Coast's continuing approval. It reasoned that West Coast remains an approved program and, although the Board has yet to decide whether to grant continuing approval, no law obligates it to decide this matter at any particular time. Second, it

7

claimed West Coast "failed to exhaust its administrative remedies by failing to request approval for its enrollment increase." Although it indicated that West Coast should have sought Board approval before increasing its student enrollment, it stated that West Coast could still request Board approval for its past enrollment increases. It then argued West Coast's failure to pursue this potential administrative remedy was fatal to its suit. Third, it asserted it properly interpreted and applied section 1432. And fourth, contesting West Coast's due process claim, it contended its actions had not deprived West Coast of any right as West Coast remains an approved program.

The trial court denied each of West Coast's claims. It found the Board properly concluded that the phrase "substantive change" in section 1432, subdivision (b) covers significant changes in enrollment, even though a change in enrollment is not one of the examples listed in the regulation. It reasoned that section 1432, subdivision (b) offers only a nonexhaustive list of examples of substantive change and that a significant change in enrollment is comparable to the listed examples in that it "affects all aspects of the nursing program's efficacy." It further found this reading consistent with the whole of section 1432 and the Board's broader authority to oversee and regulate nursing programs. The trial court also rejected West Coast's claims that the Board based its interpretation on an underground regulation and that section 1432, subdivision (b) was unconstitutionally vague as applied. Based on these findings, the trial court entered judgment in favor of the Board and its executive officer.

DISCUSSION

I

As all parties agree, the principal question in this case is whether West Coast made a "substantive change" within the meaning of section 1432, subdivision (b) when it increased annual student enrollment from 500 to 850 over a five-year period. In evaluating this question, we start with the regulatory text. Subdivision (b) of the regulation states: "An approved nursing program shall not make a substantive change

8

without prior board authorization.  These changes include:  [¶]  (1) Change in location.  [¶]  (2) Change in ownership.  [¶]  (3) Addition of a new campus or location.  [¶]  (4) Significant change in the agreement between an approved nursing program that is not an institution of higher education and the institution of higher education with which it is affiliated."

Much of the parties' arguments focus on the regulation's second sentence, the statement that a substantive change includes certain listed examples.  The word "include," as the parties acknowledge, is "ordinarily a term of enlargement rather than limitation."  (*Ornelas v. Randolph* (1993) 4 Cal.4th 1095, 1101 (*Ornelas*).)  When a general term is said to include certain specified examples, courts ordinarily will not construe the general term to consist only of those examples.  (*Ibid.*; see also *Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 774 ["The 'statutory definition of a thing as "including" certain things does not necessarily place thereon a meaning limited to the inclusions' "].)  For example, in construing a sentence saying that "pets include dogs, cats, and birds," a court would typically not construe the word "pets" to consist of only dogs, cats, and birds.

But the offered examples may still serve to limit the scope of the regulation.  As the California Supreme Court has explained, when a statute (or regulation) provides specific examples of a general term that all share a unifying trait, the examples often serve to cabin the contextual meaning of the general term.  (*Ornelas, supra*, 4 Cal.4th at p. 1101 [" 'when a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope' "].)  "The rule is 'based on the obvious reason that if the Legislature [or other rulemaking body] had intended the general words to be used in their unrestricted sense, it would not have mentioned the particular things or classes of things which would in that event become mere surplusage.' "  (*People v. Arias* (2008) 45 Cal.4th 169, 180.)

9

However, when the offered examples "do not appear to share any unifying trait which would serve to restrict the meaning of [the general term]," the limiting principle is inapplicable. (*Ornelas, supra*, 4 Cal.4th at p. 1101.) And even when the listed examples do share a unifying trait, the limiting construction will still be inapplicable if it conflicts with the regulation's purpose. Our role in construing a regulation is to ascertain and apply the underlying regulatory intent, not simply to mechanically apply general principles of construction. (See *Wishnev v. The Northwestern Mutual Life Ins. Co.* (2019) 8 Cal.5th 199, 213-214 ["[m]axims of statutory construction . . . are not immutable rules but instead are guidelines" and cannot serve to override " 'the underlying legislative intent' "].)

Here, we agree with the parties that the word "include" in section 1432 serves as a term of enlargement. Nothing in the regulatory text or any relevant statutory text suggests we should depart from this ordinary understanding of the word. Nor does the regulatory history for section 1432. According to the Board's written rationale for its 2010 rulemaking, section 1432's proposed language would cover, "e.g., change in ownership, change in location, addition of new campus, etc." Two terms in this sentence—"e.g." and "etc."—demonstrate that the Board intended its list of examples in section 1432 to be a nonexhaustive one. Consistent with this regulatory history and our general understanding of the term "include," we construe the regulation to cover more than simply the four examples listed in the regulation—that is, more than simply a "[c]hange in location," a "[c]hange in ownership," an "[a]ddition of a new campus or location," and a "[s]ignificant change in the agreement between an approved nursing program that is not an institution of higher education and the institution of higher education with which it is affiliated." (§ 1432, subd. (b).)

Nevertheless, the offered examples in section 1432 serve to limit the meaning of "substantive change." Both parties agree that the phrase "substantive change" in section 1432 does not cover all substantive changes in an approved nursing program;

10

it only covers those substantive changes that are comparable to the examples listed in the regulation. Although the parties have not identified a common unifying trait in the listed examples, in considering the regulatory history for section 1432, it appears there is a broad unifying trait: changes that can have a significant impact on a nursing program. According to the Board's written rationale for its 2010 rulemaking, the "proposed modification addresses the emergent issue of approved programs making changes that impact the nursing program, e.g., change in ownership, change in location, addition of new campus, etc." The Board added that these are changes that "may affect the program's ability to develop, implement, or sustain a prelicensure program, or may result in noncompliance with one or more regulatory requirements in section 1424[2] pertaining to nursing program organization, administration, and resources."

Considering this broad unifying trait, we conclude a significant increase in student enrollment like the one in this case is consistent with the examples specified in section 1432. Such an increase in enrollment, like the examples listed in the regulation, can have a significant impact on a nursing program. It can, for instance, leave a program with too few teachers, inadequate facilities, and insufficient equipment for a growing student body. And in light of such possible impacts, it surely "may affect the program's ability to develop, implement, or sustain a prelicensure program, or may result in noncompliance with one or more regulatory requirements in section 1424 pertaining to nursing program organization, administration, and resources"—which is precisely the type of change that the Board had in mind when it drafted section 1432, subdivision (b). Construing section 1432, subdivision (b) to cover significant changes in enrollment is

---

**2** Section 1424 describes various administrative and organizational requirements for nursing programs. It states, for instance, that a nursing program "shall have" sufficient physical space, equipment, and other resources. (§ 1424, subd. (d).)

11

consistent with the Board's stated understanding of a "substantive change" in the regulatory history.[3]

Construing section 1432, subdivision (b) to cover significant changes in enrollment is also consistent with the broader regulatory scheme governing nursing programs. Again, as the regulatory history demonstrates, the regulation serves in part to ensure that nursing programs do not pursue substantive changes that will "result in noncompliance with one or more regulatory requirements in section 1424 pertaining to nursing program organization, administration, and resources." Requiring a nursing program to obtain Board approval before significantly increasing enrollment advances the Board's interest in preventing these types of changes and in ensuring compliance with the broader regulatory scheme governing nursing programs. It allows the Board to ensure that the nursing program will continue to have "sufficient resources, including faculty, library, staff and support services, physical space and equipment, including technology, to achieve the program's objectives." (§ 1424, subd. (d).) And it allows the Board to ensure that students—both at the subject nursing program and at nearby programs—will continue to have sufficient opportunities to take the requisite number of units in clinical practice. (See § 1426, subd. (c)(1) [a nursing program's curriculum must include 18 semester units (or 27 quarter units) in clinical practice]; see also Bus. & Prof. Code,

<hr />

[3] Attempting to depict the regulatory history in an even more favorable light, the Board claims section 1432, subdivision (b) "arose out of issues stemming from the significant growth of nursing programs in California." It cites in support the declaration of Loretta Melby, who in turn cited a Board report from 2010. But although the cited report discusses "the expansion of nursing programs," along with "major issues" associated with this expansion, it never once suggested that section 1432 was adopted to address these issues. It never even cited section 1432. Nor do we find anything else in the declaration of Loretta Melby, who joined the Board years after section 1432's adoption, tending to support her claim concerning the Board's reasons for adopting the regulation.

12

§ 2786, subd. (c) ["The board's regulations shall be designed to require all schools to provide clinical instruction in all phases of the educational process . . . ."].)

The latter consideration—ensuring adequate clinical opportunities for students—was highlighted in a 2010 report that the Board issued a few months after it promulgated section 1432. In the report, the Board noted that it "is aware there have been instances where . . . educational programs have had difficulty obtaining clinical placements or have been terminated or replaced at clinical sites where their students complete clinical experiences as part of their nursing education." The Board went on to describe one cause of this issue: a "significant increase in nursing students" in recent years. It explained that this increase, although desirable to address a nursing shortage, has resulted in many nursing programs having "difficulty finding and/or maintaining clinical sites as they compete with other educational programs at a time when employers are downsizing and they have less patients." The Board later added that "[c]linical displacement is largely a problem affecting students of junior college and other public school programs." It explained that "public schools do not have the ability to pay hospitals and other clinical sites for the placement of their students, while private universities with high tuition rates are able to secure clinical sites to the detriment of the public school students."

Requiring nursing programs to obtain Board approval before significantly increasing class enrollment helps the Board limit this displacement and ensure sufficient clinical opportunities for students. It also, as noted, helps the Board ensure that these nursing programs will continue to have sufficient resources, including faculty, for their students. (§ 1424, subd. (d).) Whether a program has sufficient resources for its students may depend in part on the size of the program class. And whether students will have adequate opportunity for clinical placement may also depend in part on the size of the program class. A region that can support clinical opportunities for 500 students may not be able to support 850 students. And a school with sufficient resources for 500 students may not have sufficient resources for 850 students. Requiring nursing programs to obtain

13

Board approval before significantly increasing class enrollment thus helps the Board ensure that these two requirements described in the broader regulatory scheme—sufficient resources and clinical opportunities for students—are satisfied.

All these considerations—section 1432's text, its regulatory history, and the overall regulatory scheme—lead us to conclude that the Board had ample authority to consider West Coast's significant increase in student enrollment to be a substantive change within the meaning of section 1432, subdivision (b). (See *American National Ins. Co. v. Fair Employment & Housing Com.* (1982) 32 Cal.3d 603, 608-610; *People v. Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 638-639, 641; *Loyola Marymount University v. Los Angeles Unified School Dist.* (1996) 45 Cal.App.4th 1256, 1260-1262.)[4]

## II

West Coast nevertheless asserts various arguments urging reversal of the judgment. We conclude none of them have merit.

## A

West Coast first addresses the language of the regulation. It acknowledges that section 1432, subdivision (b)'s "use of the word 'include' prior to describing the four specifically enumerated 'substantive change[s]' " shows the regulation covers more than simply these four listed examples. Nevertheless, it argues "the act of admitting a single additional student in an approved program is different in kind from" these examples. That may be, but our focus is on the application of section 1432 to the facts before us: an increase of hundreds of students, not a single student. We are satisfied that West Coast's

---

[4] The Board adds that principles of deference further favor this reading, asserting it is entitled to substantial deference because it is interpreting its own regulation. West Coast disagrees, contending the Board is entitled to no deference because its interpretation is neither longstanding nor consistent. We need not resolve the level of deference the Board should be afforded in this matter, for even without granting the Board any deference, we still find its application of section 1432 to the facts of this case was sound for the reasons discussed.

significant increase in enrollment could be regarded as a substantive change within the meaning of section 1432, subdivision (b).

B

West Coast further argues that because the Board "already has the authority pursuant to other sections of the regulatory scheme to police significant changes in enrollment that may impact a program's ability to provide a quality nursing program or that may impact other nursing programs, [the Board's] reading of [section] 1432[, subdivision] (b) to also provide it with that same authority is not reasonable and does not comply with the plain text of the regulation or the overarching purpose and effect of the entire regulatory scheme." West Coast offers several examples of the Board's authority pursuant to other sections of the regulatory scheme. It notes, for instance, that "if there is evidence that a program's increased enrollment has negatively impacted a program's licensing examination passage rates, then [the Board] can police that enrollment increase pursuant to . . . [section] 1431." It adds that the same is true of any issues with program resources, citing sections 1424 through 1427. And it states that "with respect to [the Board's] stated concern about clinical displacement, [the Board] has specific authority pursuant to . . . [section 1427[, subdivision] (d) to address this exact issue, separate and apart from any purported authority under [section] 1432[, subdivision] (b)." (See § 1427, subd. (d) ["In selecting a new clinical agency or facility for student placement, the program shall take into consideration the impact that an additional group of students would have on students of other nursing programs already assigned to the agency or facility"].)

The fact that the Board may have authority in regulations other than section 1432 does not establish that it lacks authority under section 1432. The regulatory history for section 1432 indicates otherwise. As the history shows, section 1432 serves in part to prevent nursing programs from making significant changes that could undermine the requirements described in the broader regulatory scheme. According to the Board's 2010

15

rationale for proposing section 1432, it covers changes that, among other things, "may result in noncompliance with one or more regulatory requirements in section 1424 pertaining to nursing program organization, administration, and resources." Because the Board, in describing its rationale for promulgating section 1432, expressed its interest in preventing noncompliance with section 1424, we cannot accept West Coast's argument that the Board's existing authority under section 1424 (and certain other regulations) is good enough.

Moreover, several of West Coast's cited regulations only tend to show that the Board has some authority to address the adverse consequences of significant changes in enrollment *after* they occur. Section 1424, subdivision (d) for instance, explains that a "program shall have sufficient resources . . . to achieve the program's objectives," and, should a program fail to comply with this requirement, the Board can demand that the program address the deficiency. (See Bus. & Prof. Code, § 2788.) Section 1431, as another example, explains that a "nursing program shall maintain a minimum pass rate of seventy-five percent (75%) for first time licensing examination candidates," and, if a program fails to meet this requirement in two consecutive years, a "board-approval visit will be conducted." But that the Board has some authority to address the potential adverse consequences of significant changes in enrollment after they occur does not mean the Board lacks authority under section 1432 to require approval of significant changes in enrollment *before* they occur. Section 1432, subdivision (b), after all, serves to prevent certain substantive changes before implementation, not to address the adverse consequences of the changes after implementation.

C

Turning next to the regulatory history for section 1432, West Coast contends this too favors its narrow reading of the regulation. As it notes, the history shows that Board staff initially proposed a version of section 1432, subdivision (b) that would list, as one of the examples of a substantive change, "[c]hange in admission or enrollment pattern that

16

will significantly increase the number of enrolled students." The Board, for reasons never explained, ultimately declined to include the language in the regulation. According to West Coast, "[h]aving previously considered and rejected an amendment to [section] 1432 that would have required approved programs to seek approval for changes in enrollment, [the Board] cannot now claim that [section] 1432[, subdivision] (b) was intended all along to encompass that very same requirement."

West Coast points to court language that " ' "[t]he rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision." ' " (*Crespin v. Kizer* (1990) 226 Cal.App.3d 498, 513-514.) But the California Supreme Court has questioned the soundness of such construction, explaining that "[i]n most cases there are a number of possible reasons why the Legislature might have failed to enact a proposed provision." (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 28 (*Arnett*); see also *Grupe Development Co. v. Superior Court* (1993) 4 Cal.4th 911, 922-923 (*Grupe*) [" 'very limited guidance . . . can generally be drawn from the fact that the Legislature has not enacted a particular proposed amendment to an existing statutory scheme' "]; *Ingersoll v. Palmer* (1987) 43 Cal.3d 1321, 1349 [courts "can rarely determine from the failure of the Legislature to pass a particular bill what the intent of the Legislature is with respect to existing law"].)

We do not know the Board's reason for omitting staff's proposed language on enrollment changes. It might have omitted the language because it believed the text of section 1432 already covered significant changes in enrollment, or because it believed section 1432 should not cover those types of changes, or because it did not know how to quantify a significant change in enrollment. We will not speculate, as there is too little in the record to confidently resolve the question. (See *Arnett, supra*, 14 Cal.4th at p. 28; *Grupe*, *supra*, 4 Cal.4th at p. 923.)

17

West Coast claims the dispositive point is that the Board considered the language and chose not to include it, regardless of its reasons. As the Supreme Court has explained, however, the reason for declining to include proposed language matters, and when the reason is unclear, such unadopted proposals have little value as evidence of intent. (*Grupe, supra*, 4 Cal.4th at p. 923.) Attempting to distinguish such precedent, West Coast contends *Grupe* and similar cases are relevant only when considering "the value of failed post-enactment amendments to existing statutes" and not the value of failed "pre-adoption provisions to a later-adopted enactment." But the Supreme Court has rejected such a distinction. (*Arnett, supra*, 14 Cal.4th at p. 29 [the rule that an unpassed provision has little value applies to the failure to enact a new statute and also to the failure to amend an existing statute].)

In any event, the regulatory history shows the Committee believed Board approval should be required for certain changes in enrollment, even though it did not favor including the requirement in the regulation. According to the Committee minutes for the meeting when the proposed language was considered, which is the only record that appears to shed any light on this topic, the Committee instructed staff to inform each newly approved nursing program "in the initial approval letter that a Board approval is needed when [the program] makes any changes in the Board approved program, such as increasing enrollment numbers." In issuing this instruction, the Committee evidenced its understanding that the Board would have preapproval authority under section 1432 for increasing enrollment numbers.

According to West Coast, it is telling that the Committee minutes discuss the Board's preapproval authority to address increasing enrollment numbers at newly approved nursing programs while making no mention of a preapproval authority for established nursing programs. But this detail may simply reflect application of limited Board resources and not a belief that section 1432, subdivision (b) established one rule for newly approved programs and another rule for established programs. (Cf. *Heckler v.*

18

*Chaney* (1985) 470 U.S. 821, 831 [agencies have discretion to utilize limited resources].) Nothing in the text of section 1432, subdivision (b) purports to distinguish between new nursing programs and established programs; it simply refers to approved nursing programs.

Moving beyond the 2010 rulemaking history, West Coast contends more recent, posttrial rulemaking documents also support its reading of section 1432. As it explains, in 2021, the Board proposed "amend[ing] section 1432 to include increases in total annual enrollment, or any change in the frequency, timing, or number of new student admissions as a type of substantive change which requires the Board's approval." The Board reasoned that "[t]his change will alleviate stakeholder uncertainty and assist the Board in maintaining quality control over nursing education for protection of the public." The Board added that "[t]he proposed amendment will protect consumers by ensuring that approved nursing programs have adequate faculty, facilities, clinical placements, policies, procedures, staff, support services, physical space, and equipment to operate a sustainable program for the number of students the program intends to enroll." According to West Coast, this proposed rulemaking tends to show that the Board "currently lacks the power to control enrollments (because it is presently attempting to acquire that very power)" and that the Board "recognizes that its expanded interpretation of [section] 1432[, subdivision] (b) is, in fact, a new regulation."[5]

West Coast reads too much into this recent rulemaking effort. As we have explained, the existing regulatory text is broad. Although the listed examples in the regulation serve to narrow the meaning of the words, they do not narrow the meaning

---

[5] West Coast requests judicial notice of the Board's 2021 notice of proposed rulemaking, initial statement of reasons for the rulemaking, and proposed language for the rulemaking. It also requests judicial notice of a 2010 Board report that the Board relies on in its briefing. We grant the requests. (Evid. Code, §§ 452, subd. (c), 459, subd. (a).)

enough to exclude significant changes in enrollment. West Coast claims the Board believes its rulemaking is necessary because it currently lacks the power to control enrollments, but the Board said no such thing; rather, the Board said, among other things, that it sought to alleviate stakeholder uncertainty. West Coast may speculate about ulterior motives, but we decline to engage in such speculation.

## D

West Coast argues the Board wrongly relied on an "underground regulation" that failed to comply with the Administrative Procedure Act (the APA; Gov. Code, § 11340 et seq.). State agencies, with few exceptions, must adopt regulations following the procedures established in the APA. These procedures, among other things, require state agencies to provide the public with notice of proposed regulations (Gov. Code, §§ 11346.4, 11346.5), give interested parties an opportunity to comment on proposed regulations (*id.*, § 11346.8), and respond in writing to submitted written comments (*id.*, §§ 11346.8, 11346.9). Regulations wrongly adopted outside these procedures are known as underground regulations. (Cal. Code. Regs., tit. 1, § 250, subd. (a).) In West Coast's telling, the Board improperly refused to grant West Coast continuing approval based on an underground regulation—namely, a rule construing section 1432 to cover all increases in enrollment.

In evaluating West Coast's contention, we start with *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557. In that case, the California Supreme Court explained that "[a] regulation subject to the APA . . . has two principal identifying characteristics": "First, the agency must intend its rule to apply generally, rather than in a specific case," and "[s]econd, the rule must 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure.' " (*Id.* at p. 571.) The court further explained that agency regulations improperly adopted outside the APA procedures are void as underground regulations. (*Id.* at pp. 572-573.) But the court emphasized that not all agency interpretations are regulations. It noted,

20

for instance, that "interpretations that arise in the course of case-specific adjudication are not regulations, though they may be persuasive as precedents in similar subsequent cases." (*Id.* at p. 571; see also *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 556 [interpretations "announced in the context of resolving a specific case" are not regulations under the APA].)

In this case, the parties offer competing characterizations of the facts to support their claim that the Board's interpretation of section 1432 relied (or did not rely) on an underground regulation. According to West Coast, the Board adopted (and then applied in this case) a generally applicable rule construing section 1432 to cover all increases in enrollment—which, West Coast states, "is the same rule that [the Board] announced in the [2016 Guidelines]." But according to the Board, it reached a "case-specific finding" regarding West Coast that had nothing to do with the 2016 Guidelines. It adds that "[w]hat is a 'substantive change' will continue to be evaluated on a case-by-case basis," not resolved through the application of the 2016 Guidelines or any other general rule interpreting section 1432.

We find the Board's characterization better reflects the facts of this case. Although the Board has yet to act on West Coast's continuing approval, it has made clear that it believes continuing approval is inappropriate at this time because West Coast has not obtained, or even sought, Board approval under section 1432, subdivision (b) for its significant change in enrollment. It has stated as much throughout this litigation. And even before West Coast initiated this action, the Department of Consumer Affairs, writing on the Board's behalf, stated that the Board is confident that West Coast's enrollment increase qualifies as a substantive change under section 1432, subdivision (b). It reasoned that material enrollment increases are covered under the regulation. It did not suggest that the Board based its conclusion on the 2016 Guidelines, which had been withdrawn at that point and which favored a different, broader interpretation of section 1432. Nor did it suggest that the Board based its conclusion on any other general

21

rule interpreting section 1432, let alone one construing section 1432 to cover all enrollment changes.

The Board's construction of section 1432 was neither an underground regulation nor an application of an underground regulation, but instead an interpretation announced in the context of resolving this specific case. (*Alvarado v. Dart Container Corp. of California, supra*, 4 Cal.5th at p. 556; see *Tidewater Marine Western, Inc. v. Bradshaw, supra*, 14 Cal.4th at p. 571 ["interpretations that arise in the course of case-specific adjudication are not regulations"]; *Bendix Forest Products Corp. v. Division of Occupational Saf. & Health* (1979) 25 Cal.3d 465, 471 [agency's order directing an employer to both provide and pay for safety devices for its employees, based on a statute requiring an employer to "provide" safety devices, was "a specific application of laws and existing regulations" and "not a quasi-legislative judgment promulgating a new regulation or standard"]; *Carmona v. Division of Industrial Safety* (1975) 13 Cal.3d 303, 306, 310 [agency's determination in an administrative proceeding that a "short-handled hoe" was not, within the meaning of a regulation, an "unsafe hand tool" was a specific "application of an existing regulation" and "not a quasi-legislative judgment"]; see also *Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 436, fn. 13 [rejecting the idea that an agency, "before acknowledging the invalidity of . . . an underground regulation and returning to 'case-by-case' consideration," must "comply with APA notice and comment procedures for the promulgation of regulations"].)

West Coast counters that the Board's admissions in the trial court favor a different conclusion. It notes, for instance, that the Board admitted that "all other nursing schools in the state are operating with the understanding that the Board has the authority to regulate enrollment"—which, West Coast suggests, shows that everyone understands that the Board has adopted a general rule construing section 1432 to cover all enrollment increases. But those nursing schools may have simply recognized that the Board, since it withdrew its 2016 Guidelines, has found certain enrollment increases to be substantive

changes under section 1432. A few months after the Committee issued its recommendation on West Coast, for example, the Board found another nursing program had "made a substantive change without prior approval of the Board in violation of . . . [section] 1432[, subdivision] (b) by enrolling significantly more students than permitted by the Board's approval." In that case, the nursing program had increased annual student enrollment from 66 to at least 250 (and maybe even as high as 415). Although this and other case-specific applications of section 1432 may establish expectations, and may even serve as persuasive precedents in future cases, that in itself is not ground for concluding that the Board has adopted an underground regulation.

West Coast further argues the Board "obviously intends for its expanded interpretation of [section] 1432[, subdivision] (b) to apply to all nursing programs" and, during discovery in this case, admitted "it interprets [section] 1432[, subdivision] (b) to require pre-approval for *any* change in enrollment at any approved nursing program." It is true the Board initially claimed in discovery that "any change in enrollment . . . constitutes a substantive change." But shortly after, it clarified that it instead believes that any change in enrollment *could* constitute a substantive change, depending on the facts. It explained that although it believes that, perhaps in some hypothetical case, adding one student could constitute a substantive change, it does not rigidly claim that any change in enrollment is a substantive change; it instead claims that "[o]nly substantial changes that would naturally affect a school's ability to continue delivering the previously-approved educational program are subject to the Board's prior approval." This expressed understanding of section 1432's general scope, far from being an exceedingly broad one, as West Coast puts it, merely reflects the best reading of the regulation. As the Board explained in 2010 in its rationale for promulgating section 1432, which appears to align with the Board's current understanding, the regulation covers significant changes that "may affect the program's ability to develop,

23

implement, or sustain a prelicensure program. . . ." We find nothing improper in the Board's use of this language in describing its current interpretation of section 1432.

E

West Coast next suggests a nursing program's change in enrollment, no matter how significant, cannot be considered a substantive change absent evidence that the program lacks the physical, clinical, or fiscal resources to support the increased enrollment. It then asserts that no evidence of this sort is present here. But West Coast's reading improperly equates a "substantive change" with an unacceptable change. Section 1432's regulatory history shows the Board had in mind significant changes that "*may* affect," among other things, "the program's ability to develop, implement, or sustain a prelicensure program," not simply changes that *would* affect the program's viability and be unacceptable. (Italics added.)

That said, we agree such facts are important. Should a nursing program seek Board approval for a significant change in enrollment when the program has the physical, clinical, and fiscal resources to support the increased enrollment, and when clinical opportunities throughout the region will not be adversely impacted by the increased enrollment, the Board may have no reasonable basis for withholding approval. But such a fact-intensive question is not before us in this case and we do not decide the issue here. We simply note that even if the Board would have no basis for withholding approval, that does not mean the nursing program should be exempted from seeking Board approval.

F

In addition, West Coast claims the relevant question is not whether, as the Board argues, a 70 percent change in annual enrollment (from 500 to 850) over a five-year period is a substantive change; the question is whether "growth of approximately 9% each year" is a substantive change. West Coast argues the answer to this question is necessarily no. Whether West Coast had growth of approximately 9 percent each year or a higher percentage, we are not convinced that such an increase could not be considered a

24

substantive change. Such a change in enrollment could displace students in nearby nursing programs from limited clinical opportunities and adversely affect a nursing program's ability to provide sufficient resources, including faculty and physical space, for its students. (§ 1424, subd. (d).) Those are the types of adverse impacts that section 1432, subdivision (b) was intended to prevent.

G

Finally, relying on the Fourteenth Amendment's due process clause, West Coast contends section 1432 is unconstitutionally vague as applied to the particular facts of this case. As courts have long explained, " 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' " (*Cranston v. City of Richmond* (1985) 40 Cal.3d 755, 763; see also U.S. Const., 14th Amend., § 1 [no state "shall . . . deprive any person of life, liberty, or property, without due process of law"].) In West Coast's view, section 1432 violates this principle because (1) it does not provide notice of the Board's enrollment restriction; (2) the Board did not interpret section 1432, subdivision (b) to include changes in enrollment until 2016, when it issued the 2016 Guidelines; and (3) since 2016, the Board has embraced at least three different interpretations of its authority under section 1432, subdivision (b), claiming at different times that it has authority to regulate any changes in enrollment, any increases in enrollment, and any material or significant increases in enrollment.

Although an agency's new interpretation of a regulation could trigger due process concerns in some cases (see *FCC v. Fox Television Stations, Inc.* (2012) 567 U.S. 239, 254), we need not resolve the question here because West Coast has not shown that the Board's application of section 1432 has deprived it of any property or other interest protected under the due process clause. West Coast continues to have approval to operate its nursing program and, although the Board has yet to grant it continuing approval, the

terms of any continuing approval are speculative at this point.  Because the Board's resolution of this matter is speculative, and because we are not persuaded that the Board's delay is enough to implicate the Fourteenth Amendment's due process clause, West Coast's due process claim is premature.  (See *NLRB v. Bell Aerospace Co.* (1974) 416 U.S. 267, 295 [party's possible reliance on an agency's past interpretations did not preclude the agency from reconsidering its interpretation; party had not shown that the adverse consequences ensuing from such reliance are sufficiently substantial and, in any event, concern about such consequences is largely speculative, for the agency has not yet finally determined the issue].)

DISPOSITION

The judgment is affirmed.  The Board is entitled to recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


            _____/S/_____
            MAURO, J.



We concur:



___/S/_____
ROBIE, Acting P. J.



___/S/_____
HULL, J.


26